777 N.W.2d 779 (2010)
279 Neb. 220
STATE of Nebraska, appellee,
v.
Terry J. SELLERS, appellant.
No. S-08-434.
Supreme Court of Nebraska.
January 15, 2010.
*783 Clarence E. Mock, Oakland, and Denise E. Frost, of Johnson & Mock, for appellant.
Jon Bruning, Attorney General, and George R. Love, Columbus, for appellee.
*784 HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
GERRARD, J.

I. NATURE OF CASE
Terry J. Sellers was convicted of two counts of first degree murder, one count of attempted murder, and three counts of use of a deadly weapon to commit a felony in connection with those charges. Sellers appeals, arguing that the district court failed to properly instruct the jury and that his counsel was ineffective in failing to object to those jury instructions. Sellers also asserts that the court erred in refusing to allow the admission of evidence seized during the arrest of a State's witness and in overruling his motion for mistrial after alleged misconduct by a prosecution witness and her attorney at trial. Finding no error, we affirm Sellers' convictions and sentences.

II. BACKGROUND
Viewing the evidence in a light most favorable to the State, as we must, the prosecution witnesses generally testified that Sellers and Taiana Matheny engaged in a scheme whereby Matheny would lure men to secluded locations so that she and Sellers could rob and murder them. The State's evidence indicated that over the course of about 4 days in late February 2005, Sellers and Matheny successfully robbed and shot to death two men, Kevin Pierce and Victor Ford, and robbed and unsuccessfully attempted to murder another, DaWayne Kearney.
Sellers and Matheny were arrested after their confrontation with Kearney went awry. Sellers was charged with two counts of first degree murder for the deaths of Pierce and Ford, one count of attempted murder of Kearney, and three counts of use of a deadly weapon to commit a felony in connection with those charges. Matheny testified against Sellers at trial pursuant to a plea agreement, and her testimony was the foundation of the State's case against Sellers. Sellers, who also testified at trial, denied Matheny's accounts of the killings.
Sellers was convicted of all charges. He was sentenced to life imprisonment for the murders of Pierce and Ford, 40 to 50 years' imprisonment for the attempted murder of Kearney, 50 to 50 years' imprisonment each for use of a weapon to commit the Pierce and Ford murders, and 40 to 50 years' imprisonment for use of a weapon to commit the Kearney felony. The sentences were to be served consecutively. Sellers has appealed through new counsel. Other facts relevant to the specific issues raised on appeal will be set forth below as necessary.

III. ASSIGNMENTS OF ERROR
Sellers assigns, renumbered and restated, that (1) the trial court erred in denying Sellers' motions for mistrial and for a jury instruction, after prejudicial conduct by a prosecution witness and her attorney during trial; (2) the trial court erred in giving jury instruction No. 22; (3) the trial court erred in giving jury instruction No. 24; (4) the trial court erred in refusing to permit Sellers to adduce evidence of two handguns seized from the residence where Kearney was arrested; and (5) Sellers received ineffective assistance of counsel at trial, because his counsel failed to object to jury instructions Nos. 22 and 24.

IV. ANALYSIS

1. DISTRICT COURT DID NOT ERR IN OVERRULING MOTION FOR MISTRIAL
Sellers first asserts the district court erred in failing to grant him a mistrial, or *785 a jury instruction, because of prejudicial acts and statements by Matheny and her counsel at trial. Specifically, Sellers argues that his trial was tainted by Matheny's weeping and vomiting during her testimony and by an attorney-client objection voiced by Matheny's attorney from the gallery.

(a) Standard of Review
The responsibility for conducting a trial in an orderly and proper manner for the purpose of ensuring a fair and impartial trial rests with the trial court, and its rulings in this regard will be reviewed for an abuse of discretion.[1] The decision whether to grant a motion for mistrial is within the discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of discretion.[2] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[3]

(b) Matheny's Conduct During Testimony

(i) Background
Matheny testified generally that the killing of Pierce was the end result of a sequence of events that began when she met Pierce at a gas station, flirted with him, and got his telephone number. Later that night, Matheny, Sellers, and Sellers' cousin, Terrell Thorpe, went to an apartment complex where Matheny had arranged to meet Pierce. While waiting for Pierce to arrive, Sellers asked Matheny if she was afraid of guns and she replied no. Matheny also testified that while waiting for Pierce to arrive, Sellers stated that "somebody was going to die that night." When Pierce arrived, Matheny exited her vehicle and walked Pierce around the building to where Sellers and Thorpe were waiting. Sellers and Thorpe rushed Pierce, put him on the ground between the garage and a Dumpster, and went through his pockets. Matheny testified that Sellers told her to go through Pierce's pockets. But Matheny was unable to get into the pockets, so she removed Pierce's pants and shoes. Sellers knelt down next to Pierce's head and gave Matheny a glove. Sellers placed a gun at the base of Pierce's head. Matheny testified that Sellers placed her hand, with the gun, at the base of Pierce's head. She pulled the trigger.
During Matheny's testimony about the killing of Pierce, Matheny cried a great deal and, unexpectedly, vomited into a trash can. Shortly after Matheny vomited, the court took a recess "so that [Matheny] can compose herself and get cleaned up, and the jury has  is in their jury room." At that point, Sellers' counsel made a motion for mistrial, outside the presence of the jury, arguing that Matheny's conduct was "highly prejudicial to [Sellers], and it was done in front of the jury." Sellers' counsel pointed out that Matheny "[has] been weeping out loud during most of her  the second part of the testimony." Sellers' counsel noted that unlike Matheny's testimony at trial, in her previous statements to police, "nothing of this nature, crying, carrying on, ever happened." Sellers' counsel asserted that the jury was "quite distressed" by Matheny's conduct. The court overruled the motion for mistrial.
Sellers then requested a jury instruction, before testimony resumed, which *786 would admonish the jury that it was to disregard Matheny's conduct and that no sympathy for witnesses should enter into its deliberations. The court also overruled that request, stating that the jury would be instructed during the instruction phase that "sympathy or prejudice or bias shall not be a part of [its] deliberations or consideration." Sellers argued that the end-of-trial instruction was insufficient, but the jury was instructed as set forth above.

(ii) Analysis
A mistrial is properly granted in a criminal case where an event occurs during the course of a trial which is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial.[4] Egregiously prejudicial statements of counsel, the improper admission of prejudicial evidence, and the introduction to the jury of incompetent matters provide examples of events which may require the granting of a mistrial.[5]
We have reviewed episodes of emotion during trial on several occasions. In Wamsley v. State,[6] we recognized that when there are outbursts of emotion in the courtroom, it is within the sound discretion of the trial court to deal with them in such a manner as to best preserve the judicial atmosphere and ensure a fair and impartial trial for the defendant. In that case, a rape prosecution, we held that the defendant was deprived of a fair trial because of the cumulative effect of prejudicial acts and statements at trial.
The prejudicial acts in Wamsley included emotional outbursts by the victim and her father and improper conduct of a county attorney expressing his personal opinions in argument to the jury. Some of the victim's outbursts were heard throughout the floor of the courthouse on which the courtroom was located. And at one point during the victim's cross-examination, her father rose from the audience and stated, "`That's enough,'" and then proceeded to the witness stand and assisted the victim down from the stand.[7] The trial court took no action. The trial court later overruled a motion for mistrial and did not admonish the jury to disregard the outbursts. We held that the defendant in Wamsley was denied a fair and impartial trial, noting that sympathy for the victim and hostility toward the defendant could have been alleviated by, among other things, rebukes to those who violated established rules of conduct and admonishing the jury to disregard such incidents and to return a dispassionate verdict based solely on the evidence before it.
By contrast, in State v. Scott[8] we examined whether an elderly witness' tearful conduct prejudiced a criminal defendant charged with shooting that witness and killing her husband. In Scott, the witness stumbled while leaving the witness stand and began to weep because of an injury to her leg. We affirmed the trial court's decision to overrule the defendant's motion for mistrial, noting that the witness had shown no emotion during her testimony and that her weeping was the result of her stumbling and hurting her leg, not her testimony. Unlike Wamsley, the Scott court admonished the jury not to consider *787 the incident, because it had no bearing on the guilt or innocence of the defendant. We concluded that refusing to declare a mistrial did not warrant reversal.
Guided by these principles, we conclude that Matheny's conduct was not ground for mistrial. In the present case, there is nothing in the record indicating that Matheny's weeping during portions of her testimony or her sudden illness had any bearing on the guilt or innocence of Sellers. While the trial court did not admonish the jury immediately following the incidents of emotion, the jury was instructed both before and after trial not to let sympathy or prejudice influence its verdict. Although it would have been advisable for the court to admonish the jury after Matheny's emotional testimony, its failure to immediately do so was not so untenable or unreasonable so as to constitute an abuse of discretion under these circumstances.

(c) Attorney-Client Objection
Sellers points to a second incident he claims tainted the trial  an attorney-client objection by Matheny's counsel voiced from the gallery.

(i) Background
On cross-examination, Matheny was asked why she waived her speedy trial rights. Matheny responded by invoking her attorney-client privilege. After Sellers' counsel asked the judge to compel Matheny to answer, Matheny's attorney objected, from the gallery, "Judge, I don't believe he can." Questioning continued, and Matheny testified that she waived a speedy trial on advice of counsel. Matheny's counsel then stated, "[S]he's just testified about my advice to her which is privileged." Sellers' counsel then moved to strike Matheny's counsel's statements, because "[h]e's not a party to this case." The judge overruled the motion to strike. After a brief sidebar, the judge excused the jury and a hearing was held. After the hearing, the court allowed Matheny to assert the privilege.

(ii) Analysis
The record reveals that following the attorney-client objection, Sellers' counsel moved to strike Matheny's counsel's statements but did not move for a mistrial. Absent plain error, an issue not raised to the trial court will not be considered by this court on appeal.[9] Furthermore, when a party has knowledge during trial of irregularity or misconduct, the party must timely assert his or her right to a mistrial.[10] One may not waive an error, gamble on a favorable result, and, upon obtaining an unfavorable result, assert the previously waived error.[11] Here, Sellers moved to strike Matheny's counsel's statements, but he did not move for mistrial based upon those remarks. As a result, he has waived any error that may have resulted from those remarks.
Sellers also makes passing reference to other allegedly disruptive behavior during the trial, but did not assign error to any of the court's decisions in that regard, so we will not consider other alleged disruptions. On the issues presented in Sellers' brief, we conclude that the district court did not abuse its discretion in overruling Sellers' motion and we find this assignment of error to be meritless.

2. DISTRICT COURT DID NOT ERR IN GIVING JURY INSTRUCTION NO. 22
Sellers next argues that the district court erred in giving jury instruction No. 22.

*788 (a) Background
Two informal jury instruction conferences were held off the record, and one formal conference was conducted on the record. Neither the State nor Sellers objected to the jury instructions ultimately given to the jury. Jury instruction No. 22, regarding accomplice testimony, provided:
There has been testimony from Taiana Matheny, a claimed accomplice of the Defendant. You should closely examine her testimony for any possible motive she might have to testify falsely. You should hesitate to convict the Defendant if you decide that Taiana Matheny testified falsely about an important matter and that there is no other evidence to support her testimony.
As a threshold matter, we note that because Sellers did not object to instruction No. 22, or any jury instruction for that matter, the issue on appeal is whether the instruction given was so deficient as to constitute plain error, which we have defined as error of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process.[12] Sellers waived his right to complain regarding instruction No. 22, and, for the following reasons, we conclude there was no plain error requiring reversal.

(b) Standard of Review
Whether jury instructions given by a trial court are correct is a question of law.[13] When issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below.[14]

(c) Analysis
Sellers initially argues that the use of the term "claimed accomplice" in instruction No. 22 created a sort of judicial finding that Matheny was an accomplice to Sellers, and that such a finding was prejudicial to Sellers. However, a defendant is clearly entitled to a cautionary instruction on the weight and credibility to be given to the testimony of an alleged accomplice, and the failure to give such an instruction is reversible error.[15] The comment to NJI2d Crim. 5.6 states that "NJI2d Crim. 5.6 does not define `accomplice.'" The comment, however, appropriately makes clear that whenever a judge decides that the evidence supports a conclusion that a witness is an accomplice, then the cautionary instruction is appropriate and should be given. This is because any alleged accomplice testimony should be examined more closely by the trier of fact for any possible motive that the accomplice might have to testify falsely.
Contrary to Sellers' assertion, instruction No. 22 does not create a finding that Matheny was an accomplice to Sellers. Rather, instruction No. 22 provides in plain English that Matheny was a "claimed accomplice"  nothing more, nothing less. Instruction No. 22 does not create any type of presumption or a judicial finding that Matheny was an accomplice to Sellers; rather, it is a cautionary instruction, favorable to the accused, regarding the weight and credibility to be given to the testimony of a claimed accomplice.
Sellers also argues that instruction No. 22 is plainly erroneous because it *789 deviated from the pattern instruction. In this case, the district court modified the pattern instruction by omitting the last sentence of NJI2d Crim. 5.6, which provides, "In any event, you should convict the defendant only if the evidence satisfies you beyond a reasonable doubt of (his, her) guilt." Sellers argues that instruction No. 22 is plainly erroneous because before a jury could "hesitate to convict" Sellers using Matheny's testimony, jurors had to find that Matheny "testified falsely about an important matter and that there is no other evidence to support her testimony."
However, all the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal.[16] Although it would have been preferable for the district court to use the Nebraska jury instruction in its entirety, we certainly cannot say that the failure to do so under the circumstances of this case constituted such a plain error that to leave it uncorrected would result in damage to the integrity or fairness of this trial.
In construing an individual jury instruction, the instruction should not be judged in artificial isolation but must be viewed in the context of the overall charge to the jury considered as a whole.[17] Here, in addition to jury instruction No. 22, instruction No. 21 instructed the jury members that they were "the sole judges of the credibility of the witnesses and the weight to be given to their testimony." The jury was also instructed that the State was required to prove each and every element of the offense charged beyond a reasonable doubt and that otherwise, the jury was to find Sellers not guilty. In sum, jury instruction No. 22 did not misstate the law and when it is read in conjunction with the other jury instructions, there exists no instructional plain error requiring reversal.

3. DISTRICT COURT DID NOT ERR IN GIVING JURY INSTRUCTION NO. 24
Sellers next argues that the trial court erred in giving jury instruction No. 24, which dealt with evidence gathered during an arrest of Kearney after he repeatedly failed to appear for trial.

(a) Background

(i) Attempted Killing of Kearney
According to Matheny, the sequence of events that led to the attempted murder of Kearney and Sellers' arrest began when, at Sellers' direction, Matheny introduced herself to Kearney, flirted with him, and exchanged telephone numbers with him. According to Matheny, Sellers wanted to rob Kearney because he was a drug dealer and had money.
The following evening, Sellers and Matheny retrieved a handgun from Thorpe and drove to an apartment complex. Matheny arranged to have Kearney meet her there. Matheny testified that when Kearney pulled into the apartment complex, Sellers exited Matheny's car and hid behind a tree. Kearney parked next to Matheny's car. Matheny got into Kearney's car and talked with him briefly. They exited Kearney's car, and as they started walking toward the apartment building, Sellers approached Kearney and put the gun to his head.
Kearney and Sellers started fighting, and Kearney wrested the gun away from Sellers. The gun fired twice during the *790 struggle. At some point in the fight, Sellers asked for Matheny's help, so Matheny dug her fingernails into Kearney's eyes. Matheny and Kearney testified that Sellers had a knife and stabbed Kearney repeatedly, until Kearney stopped moving. Kearney testified that eventually, he "played ... dead." Lying face down, Kearney could hear and feel Matheny and Sellers going through his pockets and removing his rings. At that time, someone yelled "about the cops," so Matheny and Sellers ran to Matheny's vehicle and drove out of the parking lot.
Sellers' account of that night is different from that of Matheny and Kearney. Sellers testified that he and Matheny went to the apartment complex to meet Kearney to buy some marijuana. Sellers testified that after he asked Kearney for some marijuana, "it got crazy." According to Sellers, Kearney pulled out a gun and fired it. Sellers testified that he ran from Kearney but doubled back because he did not want to leave Matheny alone with Kearney. A fight ensued. Sellers grabbed his pocketknife and started "swinging wildly." Sellers and Kearney fell to the ground, and Kearney "rolled on top" of Sellers. Sellers testified that Matheny pulled Kearney off and that Sellers and Matheny then ran to the car.
When Kearney was found by police, he was screaming, "They tried to kill me. They tried to kill me." Kearney was transported to the hospital by ambulance. A gun was found at the scene within arm's length of Kearney. The Omaha Police Department crime laboratory determined that the bullets that killed Pierce and Ford had been fired from that gun. A short time after Matheny and Sellers fled the scene, Omaha police stopped Matheny's car and arrested Matheny and Sellers. Matheny's coat appeared to have blood on it, and Sellers also had bloodstains on his clothing. Sellers had a knife in his pocket with what appeared to be blood on it, a small amount of marijuana, and $217 in cash.

(ii) Arrest of Kearney
After numerous unsuccessful attempts to serve Kearney with a subpoena to testify in the instant trial, Kearney was arrested on capias at the home of Jeremiah Brodie. Brodie and a woman named Stenette Sturdivant were also detained. During the arrest and a subsequent search of Brodie's residence, Omaha police officers found handguns, ammunition, marijuana, and cash. Brodie was charged with being a felon in possession of a firearm and possession of marijuana with intent to deliver, and Sturdivant was charged with possession of stolen firearms and possession of marijuana with intent to deliver. Kearney was not charged with any offense. Omaha police officer Dave Bianchi testified that Kearney was not charged, because "I didn't believe we had any evidence against him," explaining that Sturdivant admitted the guns were hers and that there was no evidence Kearney was in possession of the guns or of the marijuana.
The State filed a motion in limine to exclude evidence regarding the marijuana, firearms, and failure to charge Kearney with any crime. The district court ruled that Sellers could question Kearney as to what benefit, if any, he may have received on a plea agreement and why Kearney was not arrested in regard to the marijuana and cash. The court refused, however, to allow the jury to hear evidence of the guns and ammunition found during Kearney's arrest. And the court gave jury instruction No. 24, which provided:
Evidence of marijuana and money located at [Brodie's residence in] Omaha, Nebraska, was received only for the limited purpose of the credibility of DaWayne Kearney and for no other purpose. *791 You may consider this evidence only for the limited purpose and for no other.

(b) Analysis
Sellers argues that the district court erred in giving jury instruction No. 24. However, absent plain error indicative of a probable miscarriage of justice, the failure to object to a jury instruction after it has been submitted for review precludes raising an objection on appeal.[18] Because Sellers did not object to instruction No. 24, and concedes as much, the issue on appeal is whether the instruction given was so deficient as to constitute plain error, which we have defined as error of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process.[19]
Sellers argues that instruction No. 24 negated the logical inference that Kearney was a drug dealer, which was relevant and consistent with Sellers' testimony that he met with Kearney to buy marijuana, not to rob and kill him. Instruction No. 24, Sellers contends, was plainly erroneous, and it prejudiced Sellers' ability to present a complete defense to the charges of robbery and attempted first degree murder of Kearney.
Instruction No. 24, however, did not foreclose Sellers' ability to argue that Kearney was a drug dealer. Sellers was permitted to question Kearney as to the drugs and money found at Brodie's residence and about any agreement Kearney made with the State. The evidence regarding the drugs and money found during Kearney's arrest was admissible for the purpose of determining who was truthfully describing the events of the evening of the altercation  Sellers or Kearney. Moreover, the court gave two jury instructions regarding self-defense. Instruction No. 24 did not preclude the jury from considering Sellers' version of the confrontation with Kearney. Under these circumstances, it was not plain error to instruct the jury as the trial court did.

4. DISTRICT COURT DID NOT ERR IN EXCLUDING EVIDENCE OF HANDGUNS
In a related argument, Sellers contends that the district court abused its discretion when it excluded evidence of the two handguns found when Kearney was arrested.

(a) Standard of Review
When the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.[20] A trial court's determination of the relevancy and admissibility of evidence must be upheld in the absence of abuse of discretion.[21]

(b) Analysis
As noted above, Sellers argues that the court should have admitted evidence of the handguns found at the scene of Kearney's arrest. Sellers argues that this evidence supported his theory that Kearney was the aggressor and not Sellers. Had the jury been permitted to learn of the guns found when Kearney was arrested, Sellers argues, the jury could logically infer that Kearney was familiar with and possessed *792 guns. Sellers also contends that the presence of guns obtained at Kearney's arrest is consistent with and would lend support to Sellers' defense that on the night of the altercation with Kearney, Kearney brought a gun and fired it at Sellers.
Evidence which is not relevant is not admissible.[22] Relevant evidence is that which has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.[23] Under Neb. Evid. R. 403,[24] however, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.[25]
Here, we conclude that the minimal probative value of the evidence of handguns at the time of arrest was outweighed by the danger of unfair prejudice or confusion of the issues. There was no proof linking Kearney to the handguns found during his arrest. In fact, Bianchi testified that Kearney was not charged in connection with the handguns found at the Brodie residence, because there was not "any evidence against [Kearney]." Bianchi stated:
The guns we had placed in [Brodie's and Sturdivant's] hands. We could not place the guns in [Kearney's] possession at all. One of the guns, where it was located, unless he was up in the bedroom might not even known [sic] about it. But even if he did know about it, that didn't mean he was possessing them. He didn't live there.
Because there was no direct connection between Kearney and the handguns recovered during his arrest, we conclude that there was little or no probative value to the handgun evidence, and any minimal probative value would be outweighed by the danger of unfair prejudice. The district court did not abuse its discretion in excluding this evidence.

5. RECORD INSUFFICIENT TO ADDRESS INEFFECTIVE ASSISTANCE OF COUNSEL
Sellers next claims that he received ineffective assistance of counsel when his trial counsel did not object to instructions Nos. 22 and 24.

(a) Standard of Review
A claim that defense counsel provided ineffective assistance presents a mixed question of law and fact.[26] When reviewing a claim of ineffective assistance of counsel, an appellate court reviews the factual findings of the lower court for clear error.[27] With regard to the questions of counsel's performance or prejudice to the defendant as part of the two-pronged test articulated in Strickland v. Washington,[28] an appellate court reviews such legal determinations independently of the lower court's decision.[29]

*793 (b) Analysis
To prevail on a claim of ineffective assistance of counsel under Strickland,[30] the defendant must show that counsel's performance was deficient and that this deficient performance actually prejudiced his or her defense.[31] Claims of ineffective assistance of counsel raised for the first time on direct appeal do not require dismissal ipso facto; the determining factor is whether the record is sufficient to adequately review the question.[32]
We conclude that the record is not sufficient to address Sellers' claim of ineffective assistance of counsel. Even though we have found no plain error with reference to instructions Nos. 22 and 24, Sellers has not had a full evidentiary opportunity to present the alleged deficiencies of counsel for failing to object to the instructions. Conversely, there certainly could have been valid strategic reasons for Sellers' trial counsel to withhold objections to one or both of instructions Nos. 22 and 24. Without the benefit of a more complete record, we decline to evaluate Sellers' claim of ineffective assistance of counsel.

V. CONCLUSION
For the foregoing reasons, we find no merit to Sellers' assignments of error and affirm the judgment of the district court.
AFFIRMED.
NOTES
[1] State v. Iromuanya, 272 Neb. 178, 719 N.W.2d 263 (2006).
[2] State v. Floyd, 277 Neb. 502, 763 N.W.2d 91 (2009).
[3] State v. Lykens, 271 Neb. 240, 710 N.W.2d 844 (2006).
[4] State v. Mason, 271 Neb. 16, 709 N.W.2d 638 (2006).
[5] Genthon v. Kratville, 270 Neb. 74, 701 N.W.2d 334 (2005), citing State v. Groves, 239 Neb. 660, 477 N.W.2d 789 (1991).
[6] Wamsley v. State, 171 Neb. 197, 106 N.W.2d 22 (1960).
[7] Id. at 205, 106 N.W.2d at 27.
[8] State v. Scott, 200 Neb. 265, 263 N.W.2d 659 (1978).
[9] State v. Bao, 269 Neb. 127, 690 N.W.2d 618 (2005).
[10] State v. Robinson, 272 Neb. 582, 724 N.W.2d 35 (2006).
[11] Id.
[12] State v. Greer, 257 Neb. 208, 596 N.W.2d 296 (1999).
[13] State v. Robinson, 278 Neb. 212, 769 N.W.2d 366 (2009).
[14] See Iromuanya, supra note 1.
[15] See State v. Quintana, 261 Neb. 38, 621 N.W.2d 121 (2001).
[16] State v. Schmidt, 276 Neb. 723, 757 N.W.2d 291 (2008).
[17] See State v. Molina, 271 Neb. 488, 713 N.W.2d 412 (2006).
[18] State v. Greer, supra note 12.
[19] Id.
[20] Japp v. Papio-Missouri River NRD, 273 Neb. 779, 733 N.W.2d 551 (2007).
[21] See Sturzenegger v. Father Flanagan's Boys' Home, 276 Neb. 327, 754 N.W.2d 406 (2008).
[22] Neb.Rev.Stat. § 27-402 (Reissue 2008).
[23] Neb.Rev.Stat. § 27-401 (Reissue 2008).
[24] Neb.Rev.Stat. § 27-403 (Reissue 2008).
[25] State v. Gutierrez, 272 Neb. 995, 726 N.W.2d 542 (2007).
[26] State v. Jackson, 275 Neb. 434, 747 N.W.2d 418 (2008).
[27] State v. Moyer, 271 Neb. 776, 715 N.W.2d 565 (2006).
[28] Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
[29] Moyer, supra note 27.
[30] Strickland, supra note 28.
[31] State v. Jones, 274 Neb. 271, 739 N.W.2d 193 (2007).
[32] Id.