IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

STATE V. JACKSON

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

RICARDO C. JACKSON, APPELLANT.

Filed December 11, 2018.    No. A-18-063.

Appeal from the District Court for Lancaster County: SUSAN I. STRONG, Judge. Affirmed.

Joseph D. Nigro, Lancaster County Public Defender, and Timothy M. Eppler for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.

PIRTLE, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

Ricardo C. Jackson pled "no contest" to one count of terroristic threats, a Class IIIA felony, and one count of possession of a firearm by a prohibited person, a Class ID felony. The district court for Lancaster County sentenced him to consecutive sentences of 2 to 3 years' imprisonment (terroristic threats) and 12 to 16 years' imprisonment (possession of firearm). Jackson argues that his sentences are excessive and that his counsel was ineffective. For the following reasons, we affirm.

BACKGROUND

On September 7, 2017, the State filed an information charging Jackson with four counts: (1) terroristic threats, a Class IIIA felony, pursuant to Neb. Rev. Stat. § 28-311.01 (Reissue 2016) (victim Norman Brewer); (2) use of a firearm to commit a felony, a Class IC felony, pursuant to Neb. Rev. Stat. § 28-1205(1)(c) (Reissue 2016); (3) possession of a firearm by a prohibited person, a Class ID felony, pursuant to Neb. Rev. Stat. § 28-1206(1) and (3)(b) (Supp. 2017); and (4)

- 1 -

terroristic threats, a Class IIIA felony, pursuant to § 28-311.01 (victim Latoya Jones). In November, the State filed an amended information, adding "Habitual Criminal" allegations to all counts; pursuant to Neb. Rev. Stat. § 29-2221 (Reissue 2016), a habitual criminal sentencing enhancement would require a mandatory minimum of 10 years in prison, and up to a maximum of 60 years' imprisonment.

Pursuant to a plea agreement, on November 27, 2017, the State filed a second amended information charging Jackson with two counts: (1) terroristic threats, a Class IIIA felony (victim Brewer or Jones); and (2) possession of a firearm by a prohibited person, a Class ID felony. At a hearing on November 27, Jackson pled "no contest" to counts 1 and 2 of the second amended information. In exchange for Jackson's plea, the State agreed to not pursue "other potential charges arising out of this case" and to not pursue a habitual criminal enhancement. According to the factual basis provided by the State,

[T]he information primarily comes from Sergeant Miller, Lincoln Police Department, who took a couple reports regarding shootings, the first of which appeared or came in on June 21, 2017, around 4 p.m., when Latoya Jones reported she was asleep on a couch in the living room of her apartment [address given]. She fell asleep on the couch next to her unlocked front door.

She said she awoke to a figure who was standing over her and behind her back, while shining a red laser across her eyes. She recognized the figure as a man she refers to as quote, E.B., end quote. She recognized E.B. through several transactions in which she had purchased meth from E.B. E.B. had also been at [Jones'] apartment on Sunday, the Sunday before, to smoke methamphetamine, and had returned on Monday, but was denied entrance.

She gave a phone number for E.B., that matched records for defendant, . . . Jackson.

. . . E.B. was also a known nickname for . . . Jackson.

. . . Jones reported that she heard a click, followed by E.B. exclaiming, "Man," in a frustrated fashion. He then lowered the laser from her eyes and exited the apartment, shutting the door behind him.

. . . Jones reported that she feared for her life. She removed herself from the couch and found a used shell casing on the ground near the front door. She believed E.B. had a gun pointed at her, but never saw one.

Officers responding to the scene did locate a 9 millimeter Luger NFCR casing in her residence.

[Jackson] was developed as a suspect in this investigation, and several other shootings around the same time frame. In those cases, he was observed with an orange cloth wrapped around his hand, and discharging a handgun. Nine millimeter Luger casings and bullets were also located at those scenes.

On June 22, 2017, Jackson was located at [a named hotel] [address given]. He was arrested on an unrelated charge. A search warrant was executed on the room he was staying in. At the time of his arrest, [Jackson] was wearing a white tank top and blue jean shorts. The search of the hotel room revealed an orange T-shirt with obvious soot stains and bullet holes on it, consistent with being wrapped around a firearm during discharge. The search

also revealed a Taurus 9 millimeter handgun with a red laser sight hidden under the bed, with 9 millimeter Luger NFCR ammunition.

A witness was also in the room with [Jackson]. She was interviewed and admitted to being with [Jackson] at the scene of a shooting just prior to this incident.

Upon getting into his vehicle to leave the previous shooting, the witness observed [Jackson] to be in possession of a handgun. This was the same handgun that was found in the hotel room. The witness reported that after they had left the previous shooting, they drove to the area of 27th and J Streets. She reported that [Jackson] parked in an alley and exited the vehicle. He was gone for several minutes and then returned to the vehicle.

Twenty-seventh and J is in the same general area as . . . where . . . Jones resided.

With respect to Norman Brewer, who is also listed in Count 1, the terroristic threat, earlier in the day, before the . . . Jones incident, at 2:55 p.m., police were dispatched to [an address on] Hudson Street, on a shots fired call. The caller said the party responsible was a black male, and fled in a gray four-door sedan, northbound from the area.

Officers arrived on the scene and went into the home to check for any injured parties, but no one was found inside.

Several witnesses were contacted and all of them said they observed a gray, four-door sedan drive on Hudson Street and park in the front yard of the . . . Hudson address [where police were dispatched] with the front facing northwest. The driver got out of the vehicle, and was described as a 35 to 45-year-old black male, bald, and wearing a white tank top wife beater, and blue jean shorts. The driver then walked into the home, with an orange towel or cloth of some type over his right hand. A few seconds later, they heard two gunshots, a pause, and then two or three more gunshots.

Then a 45 to 55-year-old black male, short salt and pepper colored hair, gray beard, wearing a dark brown shirt, later identified as . . . Brewer, ran out of the home. [Brewer] was then seen running northbound through the alley located on the west side of the home.

The driver of the vehicle then ran out of the home with a 30 to 35-year-old white female, heavier set, short brown hair. The black male then got back in the driver's seat and the white female got into the passenger seat, and drove off northbound, following . . . Brewer.

Three 9 millimeter bullet casings were found in the living room near the front door. A bullet hole was found in the living room wall, traveling northbound into a bedroom.

[Brewer] was later found and interviewed. [Brewer] said the unknown male came into the home, called him a snitch, and fired . . . an unknown type and unknown color handgun in his direction. [Brewer] retreated to a back bedroom, but the suspect told him to come back into the living room. The suspect then fired another shot, so [Brewer] ran out of the home. [Brewer] said he did not know who the suspect was, but had seen him before. [Brewer] also reported that there was a female present at the time of the shooting, and suggested her name was Ashleigh.

Jackson was developed as a suspect in this investigation and several other shootings around the same time frame.

. . . .

The female that was with [Jackson] in the hotel room was Ashleigh Kudron. She was interviewed and admitted to being at [the] Hudson [address], visiting [Brewer], when Jackson had entered the residence. Kudron recalled Jackson asking [Brewer] if he was a snitch, and then heard a loud bang that she initially thought was a firework. She reported that [Brewer] began crying, eventually fled out of the residence. She said that she and [Jackson] got into a silver car that [Jackson] was driving. Upon getting into the car, she observed [Jackson] to be in possession of a handgun. This was the same gun that was found in the hotel room.

[Jackson's] criminal history reveals that he does have prior felony convictions.

Those events all occurring in Lancaster County, Nebraska.

The State also offered exhibits 1 and 2 into evidence, and they were received without objection. Exhibit 1 contains a certified copy of a felony conviction for Jackson from Lancaster County District Court in 2013. Exhibit 2 contains a certified copy of a felony conviction for Jackson from Douglas County District Court in 2014. The district court accepted Jackson's "no contest" pleas to counts 1 and 2, and found him guilty of the same.

The sentencing hearing was held on January 16, 2018. The district court sentenced Jackson to consecutive sentences of 2 to 3 years' imprisonment on count 1, and 12 to 16 years' imprisonment on count 2. Jackson was given 4 days' credit for time served. An order memorializing the sentences was filed that same day. Jackson now appeals.

ASSIGNMENTS OF ERROR

Jackson assigns as error that (1) the district court imposed excessive sentences and (2) he received ineffective assistance of counsel.

STANDARD OF REVIEW

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Dyer*, 298 Neb. 82, 902 N.W.2d 687 (2017). A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. *State v. Loding*, 296 Neb. 670, 895 N.W.2d 669 (2017). In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only questions of law: Are the undisputed facts contained within the record sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance? *Id.*

ANALYSIS

EXCESSIVE SENTENCE

Jackson claims the district court imposed excessive sentences under the circumstances of this case. Jackson was sentenced to 2 to 3 years' imprisonment for terroristic threats, a Class IIIA felony (count 1), and 12 to 16 years' imprisonment for possession of a firearm by a prohibited

person, a Class ID felony (count 2). A Class IIIA felony is punishable by up to 3 years' imprisonment and 18 months' postrelease supervision, a $10,000 fine, or both; there is no minimum term of imprisonment, but there is a minimum of 9 months' postrelease supervision if imprisonment is imposed. See Neb. Rev. Stat. § 28-105 (Reissue 2016). However, Jackson was not subject to the postrelease supervision portion of the sentence that normally accompanies a Class IIIA felony because he was also sentenced to imprisonment for a Class ID felony. See § 28-105(6). A Class ID felony is punishable by a mandatory minimum of 3 years in prison, and up to 50 years' imprisonment. See § 28-105. Jackson's sentences were therefore within the statutory limits.

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Stone*, 298 Neb. 53, 902 N.W.2d 197 (2017). When imposing a sentence, the sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the violence involved in the commission of the offense. See *id.* The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *State v. Chacon*, 296 Neb. 203, 894 N.W.2d 238 (2017).

Jackson was 48 years old at the time of the crimes. He was single and had six children, five of whom are adults; he reported having no dependents. He graduated from high school in 1987 and attended one year of community college. At the time of the presentence investigation (PSI), Jackson was employed as a porter on his unit at the Nebraska State Penitentiary. He was previously employed at a restaurant from November 2015 to November 2016, but left that job "'due to a parole violation'"; he reported the longest job he held was as a painter for 10 years in Illinois.

Jackson has a lengthy criminal history including convictions for: first degree sexual assault (3 to 5 years' imprisonment); violation of the Sex Offender Registration Act (three times; one sentence of 1 year in jail and two sentences of 1 to 3 years' imprisonment); assault (amended from third degree assault) (30 days in jail); third degree domestic assault (amended from strangulation) (90 days in jail); robbery (8 to 15 years' imprisonment); attempted theft by receiving (amended from theft by receiving) (6 months in jail); theft by receiving $201-$499 (amended from theft by receiving $500-$1,000) (1 year's imprisonment); theft by deception $0-$200 (180 days in jail); steal money or goods less than $300 (fine); theft by shoplifting $500-$1,500 (3 years' imprisonment); second degree forgery (twice; one sentence of 1 to 2 years' imprisonment and one sentence of 1 year's imprisonment); possession of controlled substance (amended from robbery) (1 year's imprisonment); possession of marijuana (three times; fines); possession of drug paraphernalia; DUI (7 days in jail and fine); "DUS" (nine times; various sentences of fines, jail, probation); obstructing a peace officer (30 days in jail); failure to appear (twice; one sentence 10 days in jail, one fine); and fleeing to avoid arrest (45 days in jail). Jackson was on parole at the time of the current offenses. As for his current offenses, he was a prohibited person in possession of a firearm, and he threatened at least one person with a firearm; there is also evidence that he discharged or attempted to discharge that firearm during encounters with one or more victims.

As part of the presentence investigation, the probation officer conducted a level of service/case management inventory. Jackson was assessed at a "high risk to reoffend." He scored in the "high" risk range for the following domains: Criminal History, Leisure/Recreation, Companions, Alcohol/Drug Problem, Procriminal Attitude/Orientation, and Antisocial Pattern.

At the sentencing hearing, Jackson's counsel stated that Jackson was "here today because of drug use," as he reported to the probation officer that he was under the influence of methamphetamine at the time of the offense and had been "up for [5] days" and "doesn't really remember a whole lot of anything." "[I]t's unfortunate that because of something that's a disease [Jackson] didn't know what was going on, and then he ends up where he's at today." Counsel stated that Jackson would like probation, but knows that would not happen. Counsel asked for leniency and reminded the court that Jackson was 49 years old (at sentencing), stating, "Jackson hopes that whatever sentence you give him doesn't end up being basically a life sentence where he ends up dying in prison."

Jackson personally addressed the court and said that on the day of his arrest he was in a "bad place," and that he "was extremely depressed to the point that [he] wanted to take [his] life." He said he had just "broken up with [his] [13-year-old] daughter's mom" and had lost family members as a result of being incarcerated.

The State argued that "a substantial prison sentence" was appropriate based on the serious nature of the offense, which involved firearms and the use of narcotics. The State also noted that Jackson received the benefit of a plea agreement, was on parole when these events occurred, and had a significant criminal history including multiple felony convictions.

The district court stated it would take into account the comments, as well as the other information provided in the PSI. The court found that Jackson was not an appropriate candidate for probation and that a lengthy prison sentence was necessary to protect the safety and security of the public. The court sentenced Jackson to 2 to 3 years' imprisonment for terroristic threats, and 12 to 16 years' imprisonment for possession of a firearm by a prohibited person; the sentences were to run consecutively and he was given 4 days' credit for time served.

In his brief on appeal, Jackson argues that the sentencing court failed to adequately consider his "rehabilitative needs [including his need for substance abuse treatment], his general life circumstances [including the fact that Jackson was distraught over losing his father and brother to cancer since 2005], and his willingness to enter no contest pleas." Brief for appellant at 18. However, all of that information was in the PSI, and the district court stated it considered the PSI.

Having considered the relevant factors in this case, we find that Jackson's sentences were not excessive or an abuse of discretion and his sentences are therefore affirmed. See *State v. Dyer*, 298 Neb. 82, 902 N.W.2d 687 (2017) (sentence imposed within statutory limits will not be disturbed on appeal absent abuse of discretion by trial court).

EFFECTIVENESS OF COUNSEL

Jackson is represented by different counsel on direct appeal than he was in the underlying proceedings in district court. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. Otherwise, the issue will be procedurally barred. *State v. Casares*, 291 Neb. 150, 864 N.W.2d 667 (2015).

The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. *State v. Loding*, 296 Neb. 670, 895 N.W.2d 669 (2017). The determining factor is whether the record is sufficient to adequately review the question. *Id.*

To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that counsel's performance was deficient and that this deficient performance actually prejudiced his or her defense. *State v. Sellers*, 279 Neb. 220, 777 N.W.2d 779 (2010). To show prejudice when the alleged ineffective assistance relates to the entry of a plea, the defendant must show that there is a reasonable probability that, but for counsel's errors, he or she would not have entered the plea and would have insisted on going to trial. *State v. Fester*, 287 Neb. 40, 840 N.W.2d 543 (2013). The two prongs of this test, deficient performance and prejudice, may be addressed in either order. *Id.*

In his brief on appeal, Jackson states, "Although this Court may find the record to be insufficient for review of this assignment of error on direct appeal, [he] nonetheless raises the following ineffective assistance of counsel claim as known to him in order to preserve a potential future action for post-conviction relief." Brief for appellant at 14. Jackson contends that his trial counsel was ineffective because counsel "failed to adequately investigate and prepare [Jackson's] case." *Id.* More specifically, he argues that "trial counsel failed to further investigate [Jackson's] identification as a suspect in the crimes with which he was charged." *Id.* He claims that "[o]ne victim, Ms. Benamon, was shown photographs of six possible suspects who may have been involved in the incidents on June 21, 2017," but she identified another man as the suspect, *id.*, and "Brewer, a second victim, could not identify the suspect when shown the six photographs of possible suspects." *Id.* at 15. "Despite these identification issues, trial counsel did not depose either Ms. Benamon or Mr. Brewer." *Id.* Jackson also asserts "that the firearm found in the hotel room was tested for fingerprints and DNA, but the results did not match [Jackson]" and that his counsel failed to investigate the "inconclusive fingerprints and DNA found on the firearm." *Id.*

The State claims the record is sufficient to reject Jackson's claim because the record "refutes the existence of prejudice." Brief for appellee at 7.

The likelihood of the defense's success had Jackson insisted on going to trial is relevant to this prejudice analysis. See *State v. Haynes*, 299 Neb. 249, 908 N.W.2d 40 (2018). It is relevant to the consideration of whether "'a rational defendant [would have] insist[ed] on going to trial.'" *Id.* at 263, 908 N.W.2d at 53 (brackets in original). The likelihood of the defense's success had the defendant gone to trial should be considered along with other factors, such as the likely penalties the defendant would have faced if convicted at trial, the relative benefit of the plea bargain, and the strength of the State's case. *State v. Haynes, supra*.

In this case, had Jackson not taken the plea deal and instead gone to trial, he would have gone to trial on two charges of terroristic threats pursuant to § 28-311.01 (Brewer and Jones named victims); one count of use of a firearm to commit a felony pursuant to § 28-1205(1)(c); and one count of possession of a firearm by a prohibited person pursuant to § 28-1206(1) and (3)(b). We note that "Ms. Benamon"--whom Jackson claims was a victim who identified another man when shown photos of suspects--was not a named victim in any charging information and thus her identification of another man besides Jackson is of no consequence.

As relevant here, § 28-311.01 states, "A person commits terroristic threats if he or she threatens to commit any crime of violence: (a) With the intent to terrorize another; . . . or (c) In

reckless disregard of the risk of causing such terror . . . ." As for victim Brewer, he did not know the man who called him a snitch and fired a handgun in his (Brewer's) direction. However, Brewer reported that a female named "Ashleigh" was present at the time of the shooting. Ashleigh Kudron was later found with Jackson in a hotel room. She admitted being present when Jackson entered Brewer's residence. She heard Jackson ask Brewer if he was a snitch and then she heard a loud bang. After Brewer fled the residence, she and Jackson got into Jackson's car and she observed Jackson to be in possession of a handgun; the same gun that was later found in the hotel room. As for victim Jones, she identified E.B., a man with whom she was familiar, as the man who stood over her and behind her back, while shining a red laser across her eyes; she reported that she heard a click, followed by E.B. exclaiming, "Man," in a frustrated fashion. Jones reported that she feared for her life, and after E.B. left, she found a used shell casing on the ground near the front door. She believed E.B. had a gun pointed at her, but she never saw one. Jones gave the police a phone number for E.B., that matched records for Jackson, and E.B. was also a known nickname for Jackson. Officers later found a 9 millimeter Luger NFCR casing in Jones' residence; 9 millimeter Luger NFCR ammunition was found in a search of Jackson's hotel room. Despite Brewer's inability to identify Jackson as the suspect, or the "inconclusive fingerprints and DNA found on the firearm," see brief for appellant at 15, the State still had two eye-witnesses, Jones and Kudron, to help prove both terroristic threats charges against Jackson.

Section 28-1205(1)(a) states in relevant part, "Any person who uses a firearm . . . to commit any felony which may be prosecuted in a court of this state commits the offense of use of a deadly weapon to commit a felony." Use of a deadly weapon, which is a firearm, to commit a felony is a Class IC felony. § 28-1205(1)(c). Here, the State had evidence that Jackson used a firearm to commit the terroristic threats felony.

As relevant here, a person commits the offense of possession of a deadly weapon by a prohibited person if he or she possesses a firearm and has previously been convicted of a felony. See § 28-1206(1). The State had evidence that Jackson was in possession of a deadly weapon (firearm). And exhibits 1 and 2 received at the plea hearing show that Jackson had previous felony convictions in Lancaster and Douglas Counties.

Given the strength of the State's case under the original charges, it is not likely a rational defendant would have insisted on going to trial. Also, under the original charges, Jackson would have been facing the following sentences: up to 3 years' imprisonment, a $10,000 fine, or both, on each of the two terroristic threats charges; a mandatory minimum of 5 years in prison, and up to 50 years' imprisonment for the use of a firearm to commit a felony charge (this sentence is required to be consecutive to any other sentence imposed, see § 28-1205(3)); and a mandatory minimum of 3 years in prison, and up to 50 years' imprisonment for the possession of a firearm by a prohibited person charge. Additionally, the first amended information included allegations that Jackson was a "Habitual Criminal," pursuant to § 29-2221, and thus Jackson faced a potential sentencing enhancement. Section 29-2221(1) states:

> Whoever has been twice convicted of a crime, sentenced, and committed to prison, in this or any other state or by the United States or once in this state and once at least in any other state or by the United States, for terms of not less than one year each shall, upon conviction of a felony committed in this state, be deemed to be a habitual criminal and *shall be punished by imprisonment* in a Department of Correctional Services adult correctional

facility *for a mandatory minimum term of ten years and a maximum term of not more than sixty years*[.]

(Emphasis supplied.) Exhibits 1 and 2 received at the plea hearing show that Jackson had previous felony convictions in Lancaster County (sentenced to 3 years' imprisonment) and Douglas County (sentenced to 1 to 1 year in prison), and Jackson's PSI reveals numerous felony convictions and prison sentences for 1 year or more.

Instead, under the amended charges in the plea agreement, Jackson faced up to 3 years in prison, a $10,000 fine, or both on count 1, and a mandatory minimum sentence of 3 years in prison, and up to 50 years' imprisonment for count 2. With the significantly reduced mandatory minimum and the overall reduction in the potential maximum sentence, Jackson cannot show a reasonable probability that he would have gone to trial, thus he cannot show prejudice. Therefore, Jackson's ineffective assistance of counsel claims regarding failure to investigate victim identifications of the suspect and inconclusive fingerprint and DNA evidence are without merit.

## CONCLUSION

For the reasons stated above, we affirm Jackson's sentences.

AFFIRMED.