State of Nebraska, appellee, v. Jose C.
Oliveira-Coutinho, appellant.
___ N.W.2d ___

Filed July 10, 2015.    No. S-13-798.

1. **Juries: Discrimination: Appeal and Error.** An appellate court reviews
   de novo the facial validity of an attorney's race-neutral explanation for
   using a peremptory challenge as a question of law.
2. **Juries: Discrimination: Prosecuting Attorneys: Appeal and Error.**
   An appellate court reviews for clear error a trial court's factual deter-
   mination regarding whether a prosecutor's race-neutral explanation is
   persuasive and whether the prosecutor's use of a peremptory challenge
   was purposefully discriminatory.
3. **Juries: Equal Protection: Prosecuting Attorneys.** In *Batson v.
   Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), the
   U.S. Supreme Court held that a prosecutor's privilege to strike individ-
   ual jurors through peremptory challenges was subject to the commands
   of the Equal Protection Clause.
4. **Juries: Prosecuting Attorneys.** A prosecutor is ordinarily entitled
   to exercise permitted peremptory challenges for any reason at all, if
   that reason is related to his or her view concerning the outcome of
   the case.
5. **Juries: Equal Protection: Discrimination.** The Equal Protection Clause
   forbids the prosecutor to challenge potential jurors solely because of
   their race.
6. **Juries: Discrimination: Prosecuting Attorneys: Proof.** Determining
   whether a prosecutor impermissibly struck a prospective juror based
   on race is a three-step process. First, a defendant must make a prima
   facie showing that the prosecutor exercised a peremptory challenge
   because of race. Second, assuming the defendant made such a show-
   ing, the prosecutor must offer a race-neutral basis for striking the juror.
   And third, the trial court must then determine whether the defendant
   has carried his or her burden of proving purposeful discrimination. The
   third step requires the trial court to evaluate the persuasiveness of the

justification proffered by the prosecutor. But the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.

7. **Juries: Discrimination: Prosecuting Attorneys: Moot Question.** Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has decided the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing is moot.

8. **Juries: Prosecuting Attorneys: Discrimination: Appeal and Error.** The initial question whether a prosecutor's reasons for a peremptory challenge were race neutral is a question of law that an appellate court reviews de novo. The question is whether the stated reasons, on their face, were inherently discriminatory. In making that determination, an appellate court does not consider whether the prosecutor's reasons are persuasive.

9. **Juries: Prosecuting Attorneys.** The U.S. Supreme Court has explained that the third step of a *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), inquiry involves evaluating the prosecutor's credibility. Such credibility determinations lie within the peculiar province of the trial judge and require deference to the trial court.

10. **Criminal Law: Trial: Juries: Appeal and Error.** Whether a jury is to be kept together before submission of the cause in a criminal trial is left to the discretion of the trial court.

11. ____: ____: ____: ____. To warrant reversal, denial of a motion to sequester the jury before submission of the cause must be shown to have prejudiced the defendant.

12. **Jurors: Jury Instructions: Presumptions.** Jurors are presumed to follow their instructions unless evidence to the contrary is shown.

13. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress evidence based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error. But whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

14. **Search and Seizure: Evidence: Trial.** Evidence obtained as the direct or indirect fruit of an illegal search or seizure, the poisonous tree, is inadmissible in a state prosecution and must be excluded.

15. **Search and Seizure: Evidence.** To determine whether the evidence is a fruit of the illegal search or seizure, a court asks whether the evidence has been come at by exploitation of the primary illegality or whether

it has instead been come at by means sufficiently distinguishable to be purged of the primary taint.

16. **Evidence.** Under the independent source doctrine, the challenged evidence is admissible if it came from a lawful source independent of the illegal conduct.

17. **Evidence: Constitutional Law.** Under the attenuated connection doctrine, the challenged evidence is admissible if the causal connection between the constitutional violation and the discovery of the evidence is so attenuated as to rid the taint.

18. **Evidence: Police Officers and Sheriffs.** Under the inevitable discovery doctrine, the challenged evidence is admissible if it inevitably would have been discovered by lawful means without reference to the police misconduct.

19. **Constitutional Law: Due Process.** The determination of whether the procedures afforded an individual comport with the constitutional requirements for procedural due process presents a question of law.

20. **Constitutional Law: Appeal and Error.** Claimed violations of the compulsory process right are reviewed de novo.

21. **Constitutional Law: Witnesses: Due Process: Proof.** In order to show that his or her compulsory process or due process rights have been violated as a result of the deportation of a potential witness, a defendant must (1) make an initial showing that the government has acted in bad faith and (2) make a plausible showing that the testimony of the deported witness would have been both material and favorable to his or her defense.

22. **Trial: Evidence: Appeal and Error.** A trial court's determination of the relevancy and admissibility of evidence must be upheld in the absence of abuse of discretion.

23. **Trial: Witnesses.** Competency of a witness is an issue to be determined by the trial court and not by the jury.

24. ____: ____. The credibility and weight of a witness' testimony are for the jury to determine.

25. **Expert Witnesses: Appeal and Error.** The standard for reviewing the admissibility of expert testimony is abuse of discretion.

26. **Criminal Law: Constitutional Law: Due Process.** Under the Due Process Clause of the 14th Amendment and the Compulsory Process and Confrontation Clauses of the 6th Amendment, a criminal defendant is guaranteed a meaningful opportunity to present a complete defense.

27. **Trial: Evidence.** Evidence relating to an illustrative experiment is admissible if a competent person conducted the experiment, an apparatus of suitable kind and condition was utilized, and the experiment was conducted fairly and honestly. It is not essential that conditions existing at the time of the experiment be identical with those existing

at the time of the occurrence, but the conditions should be essentially similar, that is, similar in all those factors necessary to make the comparison a fair and accurate one. The lack of similarity regarding the nonessential factors then goes to the weight of the evidence rather than to its admissibility.

28. **Trial: Photographs.** The admission of photographs into evidence rests largely within the discretion of the trial court, which must determine their relevancy and weigh their probative value against their possible prejudicial effect.

29. **Homicide: Photographs.** In a homicide prosecution, photographs of a victim may be received into evidence for purposes of identification, to show the condition of the body or the nature and extent of wounds and injuries to it, and to establish malice or intent.

30. **Criminal Law: Motions for New Trial: Appeal and Error.** In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed.

31. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

32. **Motions for New Trial: Evidence: Witnesses.** A new trial will not ordinarily be granted for newly discovered evidence which, when produced, will merely impeach or discredit a witness who testified at trial.

33. **Trial: Prosecuting Attorneys: Appeal and Error.** When considering a claim of prosecutorial misconduct, an appellate court first considers whether the prosecutor's acts constitute misconduct.

34. **Trial: Prosecuting Attorneys: Juries.** A prosecutor's conduct that does not mislead and unduly influence the jury is not misconduct.

35. **Trial: Prosecuting Attorneys: Appeal and Error.** If an appellate court concludes that a prosecutor's acts were misconduct, the court must next consider whether the misconduct prejudiced the defendant's right to a fair trial.

36. **Trial: Prosecuting Attorneys: Due Process.** Prosecutorial misconduct prejudices a defendant's right to a fair trial when the misconduct so infected the trial that the resulting conviction violates due process.

37. **Trial: Prosecuting Attorneys.** Whether prosecutorial misconduct is prejudicial depends largely on the context of the trial as a whole.

38. **Trial: Prosecuting Attorneys: Appeal and Error.** In determining whether a prosecutor's improper conduct prejudiced the defendant's right to a fair trial, an appellate court considers the following factors: (1) the degree to which the prosecutor's conduct or remarks tended to mislead or unduly influence the jury, (2) whether the conduct or remarks

were extensive or isolated, (3) whether defense counsel invited the remarks, (4) whether the court provided a curative instruction, and (5) the strength of the evidence supporting the conviction.

39. **Trial: Waiver: Appeal and Error.** Failure to make a timely objection waives the right to assert prejudicial error on appeal.

40. **Criminal Law: Evidence.** The State is allowed to present a coherent picture of the facts of the crimes charged, and it may generally choose its evidence in so doing.

41. **Photographs: Rules of Evidence.** Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2008), does not require a separate purpose for every photograph, and it requires a court to prohibit cumulative evidence only if it substantially outweighs the probative value of the evidence.

Appeal from the District Court for Douglas County: Thomas A. Otepka, Judge. Affirmed.

Todd W. Lancaster, of Nebraska Commission on Public Advocacy, and Horacio J. Wheelock, of Horacio Wheelock Law Offices, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Stacy M. Foust for appellee.

Heavican, C.J., Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ., and Pirtle, Judge.

Heavican, C.J.

## I. INTRODUCTION

Jose C. Oliveira-Coutinho was charged with and convicted of three counts of first degree murder in the deaths of Vanderlei, Jaqueline, and Christopher Szczepanik, and also with one count of theft by deception over $1,500. The State sought the death penalty, and the jury found aggravating circumstances in connection with each of the three counts of murder. A three-judge panel was appointed for a sentencing determination hearing. Following that hearing, Oliveira-Coutinho was sentenced to three life sentences on the murder counts and 20 years' imprisonment on the theft by deception count, sentences to be served consecutively. He appeals. We affirm.

## II. FACTUAL BACKGROUND

### 1. Szczepanik/Oliveira-Coutinho Relationship

Vanderlei and Jaqueline moved from Brazil to Florida. While in Florida, their son Christopher was born. The family then moved to Omaha, Nebraska, as missionaries for their church to renovate an old school building located on South 16th Street.

At some point, the church became financially unstable and Vanderlei became involved in his own renovation and construction projects. He purchased and was renovating a property located on Park Avenue in Omaha, and his business, IGIT Services Corporation (IGIT), was also hired for a lead stabilization project in Omaha.

Oliveira-Coutinho moved from Brazil to Florida in 2005, where he met and worked for Vanderlei. He moved to Omaha with the family and resided with them at the South 16th Street property. Oliveira-Coutinho led one of Vanderlei's work crews. In early 2009, Oliveira-Coutinho contacted childhood friends Valdeir Goncalves-Santos and Elias Lourenco-Batista, who lived in Brazil, about working in the United States. Both agreed, moved to Omaha to work for Vanderlei in April 2009, and lived at the Park Avenue address.

### 2. Family Disappears

On January 6, 2010, the Szczepaniks' pastor from Florida received a telephone call from a friend of the Szczepaniks who was unable to contact the family. Jaqueline's adult daughter also had tried and failed to contact her mother. A member of Vanderlei's work crew reported that he had last seen Vanderlei near the end of the workday on December 17, 2009, at the Park Avenue address. The pastor then contacted Oliveira-Coutinho. Oliveira-Coutinho indicated that he was not concerned because Vanderlei had previously gone somewhere without telling him.

After arriving in Omaha on January 8, 2010, the pastor from Florida and another church official reported the Szczepaniks'

disappearance to the Omaha Police Department. A wellness check was then initiated at the South 16th Street address. Oliveira-Coutinho let law enforcement and church officials into the building. Located in the parking lot was a white Dodge van with in-transit papers dated December 16, 2009, another white truck apparently belonging to IGIT, and a dark-colored Volvo registered to Vanderlei. A Nissan pickup registered to Vanderlei was not in the parking lot.

Once inside the home, law enforcement noted that the living quarters looked like someone had been living there, but had just gone out, and that there were no signs of a disturbance. The next day, Oliveira-Coutinho gave the church officials another tour of the South 16th Street property, as well as a tour of the Park Avenue property. Oliveira-Coutinho indicated that he had moved to the Park Avenue property because the heat did not work at the South 16th Street address.

A missing persons investigation was opened on January 11, 2010. No response was received from Vanderlei's and Jaqueline's cell phones. E-mails to IGIT were not returned. The last day that Christopher had been at school was December 17, 2009. The last telephone call from either cell phone was from Jaqueline to Vanderlei at 8:46 p.m. on December 17. Vanderlei's Nissan truck was found on January 30, 2010, about 2½ miles from the Park Avenue location and about one-half mile from the South 16th Street location. The truck had a tow notice from 2 days earlier. A neighbor testified that the truck had been parked one afternoon in December by a Hispanic male, who said "'hi'" in English and kept walking.

### 3. CASE TRANSFERRED TO HOMICIDE

On February 1, 2010, the Omaha Police Department's homicide unit was briefed on the case. The move to the homicide unit was due to a bank surveillance video which showed that someone other than the Szczepaniks had been using the family's bank cards in Omaha on December 17, 2009. Search warrant applications were prepared on February 1, 2010, and

warrants were executed at the South 16th Street and Park Avenue addresses that same day.

While executing the warrants at the Park Avenue address, officers found items matching those purchased with the family's bank cards after the family had gone missing, notably two space heaters. Clothing and hats similar to those worn by the persons seen in the bank surveillance video were also seized, including a black hat with stylized white lettering that spelled "Fox" and a tan hooded coat. In the same room where the black hat was found, law enforcement recovered driving documents, blank checks, and deposit slips, all in Oliveira-Coutinho's name, as well as checks written on IGIT's account and mail postmarked December 23, 2009, and addressed to Jaqueline, Vanderlei, and IGIT.

In the master bedroom at the South 16th Street address, law enforcement found, among other items, a "Thomas the Train" bedspread, Jaqueline's eyeglasses, checks made out to IGIT totaling $95,919, checks made out to Vanderlei totaling $2,800, cash totaling $36,400, and $10,000 in Menards gift checks. In addition to those items, law enforcement noted that items at the South 16th Street address had been moved since the initial wellness check.

### 4. QUESTIONING OF OLIVEIRA-COUTINHO, GONCALVES-SANTOS, AND LOURENCO-BATISTA

Prior to exercising the search warrants on February 1, 2010, officers made contact with Oliveira-Coutinho, who was standing in the threshold of the South 16th Street property when officers arrived. Oliveira-Coutinho was wearing a tan coat, a long-sleeved camouflage shirt, and a black hat with white lettering that spelled "DC." Officers tried to communicate with Oliveira-Coutinho, but had difficulty because of a language barrier. Eventually, Oliveira-Coutinho was asked to sit in the back seat of the police cruiser. While there, he made a telephone call to a person who was able to talk with one of the officers over Oliveira-Coutinho's cell phone and interpret and

explain the situation to him. Upon arriving at the scene, officers recognized the hat worn by Oliveira-Coutinho as similar to one worn in the bank surveillance video.

Oliveira-Coutinho, Goncalves-Santos, and Lourenco-Batista were all questioned on February 1 and into February 2, 2010, and again later in February and March. When Goncalves-Santos was taken into custody, he was wearing a white jacket with black stripes on the sleeves.

### 5. Bank Records, Automatic Teller Machine Footage, and Shopping Sprees

Bank records showed that Oliveira-Coutinho's bank balance on December 10, 2009, was $476.96. In approximately the 1 month preceding, there had been just two deposits—for $600 and $363. But between December 21, 2009, and January 5, 2010, three deposits totaling $7,000 were made into Oliveira-Coutinho's bank account, all from IGIT's account. Nearly all of that money had been transferred out of the account by the end of the subsequent statement cycle, much of it through withdrawals made by a service described on his statement as "Xoom." Similar deposits were made into the accounts of Goncalves-Santos and Lourenco-Batista, again with the payments coming from IGIT. In addition, 14 automatic teller machine withdrawals were made from the IGIT and Szczepanik accounts between December 17, 2009, and January 20, 2010. No other unauthorized withdrawals occurred after February 1.

Automatic teller machine footage shows individuals in a dark-colored car and a white van, similar to the van driven by Oliveira-Coutinho, making withdrawals from the Szczepaniks' bank accounts. The first withdrawal was on December 17, 2009, at 11:59 p.m. Though faces are not discernible because the vehicle's occupants were wearing hats or hoods, one occupant appears to be wearing a long-sleeved camouflage shirt or hoodie, and in another, a tan hooded coat. Yet still another shows an occupant wearing a black hat with white stylized

lettering that spelled "Fox." According to one witness, Oliveira-Coutinho wore such a hat.

The Szczepaniks' debit cards were used to make various purchases, including purchases at a store referred to as either "Hat World" or "LIDS." At that store, a white hat with black lettering that spelled "Oklahoma" and a black hat with white lettering that spelled "DC" were purchased. On December 31, 2009, three individuals purchased items at a Wal-Mart store in Council Bluffs, Iowa. Those individuals arrived in a dark-colored sedan; one individual was wearing a tan coat with dark lining and a black hat with white letters similar to the "DC" hat, while another individual was wearing a white coat with black stripes on the sleeves.

### 6. Initial Charges

Following law enforcement's questioning of Oliveira-Coutinho and others, all were placed on immigration holds by the federal government. Lourenco-Batista was ordered deported on April 22, 2010. On July 29, Oliveira-Coutinho, Goncalves-Santos, and Lourenco-Batista were charged with unauthorized use of a financial transaction device. The charges against Goncalves-Santos and Lourenco-Batista were dropped on January 11, 2011. On January 28, Goncalves-Santos was charged with three counts of first degree murder. A few months later, Lourenco-Batista was deported.

Goncalves-Santos' trial began on August 15, 2011. After 7 days of evidence, Goncalves-Santos interrupted his trial to cooperate with the State and law enforcement. As part of this cooperation, Goncalves-Santos informed law enforcement that he and Lourenco-Batista killed the Szczepanik family at Oliveira-Coutinho's direction.

On August 25, 2011, pursuant to a plea agreement, Goncalves-Santos pled guilty to one count of second degree murder for killing Vanderlei. Also pursuant to the agreement, in exchange for his plea and truthful testimony in any current or future cases related to the murders, the State agreed to recommend a sentence of 20 years' to 20 years' imprisonment.

With credit for good time and time served, Goncalves-Santos could reduce his sentence to 7 years 5 months' imprisonment, after which he would likely be deported to Brazil. As of Oliveira-Coutinho's trial, Goncalves-Santos had not been sentenced.

### 7. Testimony of Goncalves-Santos

At Oliveira-Coutinho's trial, Goncalves-Santos testified that on December 17, 2009, he and Lourenco-Batista were working at the Park Avenue property when Oliveira-Coutinho arrived. Goncalves-Santos testified that Oliveira-Coutinho was unhappy working for Vanderlei and wanted to "get" him. Oliveira-Coutinho tried to persuade Goncalves-Santos and Lourenco-Batista to help him kill Vanderlei.

Oliveira-Coutinho gave Lourenco-Batista a baseball bat and gave Goncalves-Santos an iron bar and told them to go to the basement where Vanderlei was working and kill him. Lourenco-Batista went into the basement, but did not kill Vanderlei.

Oliveira-Coutinho then drove Goncalves-Santos and Lourenco-Batista to the South 16th Street property. The men went to Oliveira-Coutinho's bedroom, where Oliveira-Coutinho showed the others his bank balance and complained that he had no money. Goncalves-Santos testified that Oliveira-Coutinho was upset because Vanderlei had lowered their wages, because work was slow in the winter months. Oliveira-Coutinho indicated again that they had to kill Vanderlei and that it had to be "'today.'"

Oliveira-Coutinho, Goncalves-Santos, and Lourenco-Batista waited on the staircase for Vanderlei to come home. Oliveira-Coutinho handed Goncalves-Santos a box cutter that looked like a gun. Vanderlei came home. Lourenco-Batista hit Vanderlei, causing him to fall. Vanderlei screamed for Jaqueline and kept saying, "'It's me, guys.'" Vanderlei sat up, and Goncalves-Santos hit him with the iron bar. Lourenco-Batista then hit Vanderlei on the forehead. At that point, Vanderlei was apparently dead.

Meanwhile, Jaqueline came running to Vanderlei. Oliveira-Coutinho grabbed her and punched her in the mouth. He then told Lourenco-Batista to get Christopher. Jaqueline and Christopher were taken to Oliveira-Coutinho's bedroom. Goncalves-Santos testified that Jaqueline's legs and hands were taped and that "we tied her with a sock."

Oliveira-Coutinho demanded bank account numbers from Jaqueline. She told him the numbers. Oliveira-Coutinho retrieved the bank card and returned with the card and a box of checks. Oliveira-Coutinho made Jaqueline sign the checks. At this point, Oliveira-Coutinho left Lourenco-Batista with Jaqueline and Christopher while he and Goncalves-Santos went to the bank to withdraw cash. After the trip to the bank, Oliveira-Coutinho drove to the Missouri River to look for a place to "throw him away and be free of these people."

After returning to the South 16th Street address, Oliveira-Coutinho and Goncalves-Santos found that Lourenco-Batista had untaped Jaqueline's hands. Oliveira-Coutinho said that doing so was "'dangerous. This woman might hit you.'" They tied Jaqueline back up, but took the tape off her feet and put a pillowcase over her head. Oliveira-Coutinho warned her that "'[i]f you do anything, you know what's gonna happen to Christopher.'"

Goncalves-Santos and Lourenco-Batista then walked Jaqueline down the hallway to a staircase, though not the same staircase where Vanderlei was killed. Oliveira-Coutinho stayed with Christopher. Goncalves-Santos stayed at the top of the staircase. Lourenco-Batista tied a rope around Jaqueline's neck, and the other end of the rope was tied to a railing at the top of the staircase. Jaqueline begged for her life, but Lourenco-Batista pushed her down the stairs. According to Goncalves-Santos' testimony, Jacqueline "rolled over and she hit the wall. And then she rolled again and she went down, and she stayed with her head down. Her knees were almost touching the ground and she was head-down . . . ." Goncalves-Santos took the rope off Jaqueline and placed her at the bottom of

the stairs. From the bedroom, Oliveira-Coutinho asked, "'Are you done?'"

They repeated the process with Christopher. Goncalves-Santos testified that he could not "stand to look at him, to see Christopher moving around." When it was finished, Oliveira-Coutinho again asked, "'Is it over?'" Goncalves-Santos went to Christopher, who was still moving, and laid him next to Jaqueline.

While Oliveira-Coutinho looked for money, Goncalves-Santos and Lourenco-Batista wrapped the bodies in plastic and sheets and loaded them into Oliveira-Coutinho's van. Oliveira-Coutinho then drove to the Missouri River, where Goncalves-Santos and Lourenco-Batista unloaded the bodies. While Oliveira-Coutinho drove, Goncalves-Santos cut open the stomach of each body, apparently to keep the bodies from floating, and tied each body's legs to iron bars. The bodies were then placed in the river, but they continued to float. Oliveira-Coutinho was concerned that the bodies would be found, so they returned to the South 16th Street address to get a knife to cut the rope. Goncalves-Santos cut the iron bars from Vanderlei's and Jaqueline's bodies, but Christopher's body had disappeared. Goncalves-Santos threw the knife, iron bars, baseball bat, the contents of a bucket of Vanderlei's blood, and their cleaning supplies into the river.

The men returned to the South 16th Street location and cleaned more thoroughly. In addition, according to Goncalves-Santos, he and Oliveira-Coutinho parked Vanderlei's truck on a nearby street to make it look like the family had gone on vacation. The men then returned to the Park Avenue property to sleep.

Goncalves-Santos testified that they wrote checks and cashed them at a Wells Fargo Bank and also that Oliveira-Coutinho used the Szczepaniks' bank cards while with Goncalves-Santos and Lourenco-Batista. Goncalves-Santos testified that Oliveira-Coutinho hid the bank cards and checks in his van or in the attic at the Park Avenue property.

Goncalves-Santos testifed that he told his wife about the killings, but denied telling anyone else. He said that he did not tell law enforcement the truth at first because he did not know whom to trust, and admitted on cross-examination that he made inconsistent statements to law enforcement. Goncalves-Santos testified that he decided to tell the truth for Jaqueline's daughter's sake. He also testified that he believed he killed the family because he was with Oliveira-Coutinho and Lourenco-Batista when everything happened.

In addition to his testimony, Goncalves-Santos led law enforcement to the spot where the bodies had been placed in the river, though flooding prevented further search at that time. In addition, because of Goncalves-Santos' information, Vanderlei's blood was found at the South 16th Street property near a radiator in the entryway to the building. Vanderlei's blood was also found in a mop bucket located in a utility closet in the building.

On October 13, 2011, Goncalves-Santos returned with law enforcement to the location where the bodies were disposed of. Eventually, skeletal remains bundled in plastic and a "Thomas the Train" sheet were found. A pathologist testified that DNA evidence established the remains as Christopher but that the cause of death could not be determined due to the condition of the partial skeletal remains. Also recovered was a metal grate with a rope attached. Goncalves-Santos testified that the rope was the one they used to hang Jaqueline and Christopher. No other evidence was recovered, nor were Vanderlei's or Jaqueline's bodies found.

### 8. TESTIMONY OF PATRICIA BARBOSA DOS SANTOS-OLIVEIRA

Oliveira-Coutinho's wife, Patricia Barbosa dos Santos-Oliveira, testified. According to her testimony, Oliveira-Coutinho had a 5-year plan, which began in 2005, to earn money and then return to his family in Brazil. In addition, Patricia testified that Goncalves-Santos and Lourenco-Batista

owed Oliveira-Coutinho money upon their arrival in the United States.

Patricia testified that Vanderlei had "laid [Oliveira-Coutinho] off," but then rehired him at a lower wage, and that Oliveira-Coutinho was angry because he worked hard for "very little money." Oliveira-Coutinho told Patricia that Vanderlei treated him "like a slave," that Oliveira-Coutinho hated Vanderlei, and that he was thinking of killing Vanderlei. Patricia told him that "only God has the power to give life and . . . to take life" and that he could not kill Vanderlei because he could not repent from that. Oliveira-Coutinho replied that he would not kill Vanderlei because of Christopher. When Patricia later asked if Vanderlei and Oliveira-Coutinho's relationship had improved, he said that it had not but that it did not matter, because he and "the boys" had something planned. According to Patricia, Oliveira-Coutinho referred to Goncalves-Santos and Lourenco-Batista as "the boys."

At the end of January or beginning of February 2010, Oliveira-Coutinho contacted Patricia in Brazil and requested that if anything happened to him she should transfer money from his bank accounts to her bank accounts in Brazil. She testified that she did so via "Xoom." She also testified that Oliveira-Coutinho never told her that the Szczepanik family was missing.

By mid-February 2010, Patricia began almost daily contact with Goncalves-Santos's wife and assisted the Omaha Police Department in making contact with her. Patricia testified that she assisted law enforcement because "when you're made aware of a crime being committed and you don't report that crime, then I believe that you are just as guilty as the perpetrators of that crime. And I did not want to have that guilt on me."

### 9. MOTION FOR ADVANCE RULING— GONCALVES-SANTOS CROSS-EXAMINATION

As relevant on appeal, Oliveira-Coutinho filed a motion for advance ruling seeking to cross-examine Goncalves-Santos

about his sexual relations with animals, his killing or harming of animals, his threats to kill his wife, and any other violent or antisocial tendencies or behaviors. In connection with this, Oliveira-Coutinho also sought to introduce the testimony of Renan Diaz, one of Goncalves-Santos' cellmates at the Douglas County Correctional Center. Oliveira-Coutinho argued that this evidence was relevant and went to the competency of Goncalves-Santos as a witness under rule 601.[1]

The district court rejected Oliveira-Coutinho's motion for advance ruling. It reasoned that the evidence Oliveira-Coutinho sought to introduce had no bearing on Goncalves-Santos' competency as a witness and, further, did not bear on Goncalves-Santos' credibility, because none of the questions which Oliveira-Coutinho sought to ask were probative of Goncalves-Santos' truthfulness or lack thereof.

The district court further concluded that Oliveira-Coutinho could not ask Diaz questions related to specific instances of Goncalves-Santos' conduct, because such extrinsic evidence, under rule 608(2),[2] could not be used to attack a witness' credibility.

The district court next rejected Oliveira-Coutinho's contention that the evidence which he sought to admit would contradict Goncalves-Santos' presumed testimony that he, Goncalves-Santos, was not violent, but that he killed only under Oliveira-Coutinho's orders. The district court found there was nothing to suggest that Goncalves-Santos would testify that he was not violent; to the contrary, his testimony about committing the murders would tend to support the conclusion that Goncalves-Santos was violent. The evidence Oliveira-Coutinho sought to introduce, then, would not contradict Goncalves-Santos' testimony.

Finally, the district court rejected Oliveira-Coutinho's assertions that these questions of Goncalves-Santos would

[1] Neb. Evid. R. 601, Neb. Rev. Stat. § 27-601 (Reissue 2008).

[2] Neb. Evid. R. 608(2), Neb. Rev. Stat. § 27-608(2) (Reissue 2008).

show bias on the part of Goncalves-Santos against Oliveira-Coutinho. The district court reasoned that none of the questions which Oliveira-Coutinho sought to ask touched upon the relationship between Oliveira-Coutinho and Goncalves-Santos or upon Goncalves-Santos' self-interest.

Oliveira-Coutinho filed a motion to reconsider, alleging that cross-examination on the issues sought was "'reverse 404(b)'"[3] evidence offered to prove Goncalves-Santos' conscious guilt, as well as for impeachment if Goncalves-Santos testified otherwise. The court denied the motion to reconsider, reasoning that the evidence could not show Goncalves-Santos' conscious guilt where Goncalves-Santos had admitted his guilt.

### 10. OTHER PRETRIAL MOTIONS

#### (a) Motion to Sequester

Prior to trial, Oliveira-Coutinho sought a change of venue and to have the jury, once selected, sequestered for the duration of the trial due to pretrial publicity. The district court granted the motion with regard to sequestering the jury for deliberations but otherwise denied the motion, concluding that the evidence before it showed that while there had been significant pretrial publicity, it was not "invidious, inflammatory, misleading, or biased against [Oliveira-Coutinho]."

#### (b) Family Photograph

Prior to trial, Oliveira-Coutinho sought to have a family photograph of the Szczepaniks excluded from evidence as prejudicial. The district court denied that motion, agreeing with the State that in this case, the photograph was necessary for purposes of identification.

#### (c) Handwriting Expert

Oliveira-Coutinho also objected to the State's handwriting expert, Charles Eggleston. The district court held a

---

[3] See, Fed. R. Evid. 404(b); Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2014).

*Daubert*/*Schafersman* hearing regarding the admissibility of Eggleston's testimony.[4] The district court found that Eggleston qualified as an expert and that his testimony satisfied the standards of *Daubert*/*Schafersman* and was therefore admissible.

At trial, Eggleston testified that the evidence strongly supported the conclusion that Vanderlei wrote the checks found during the execution of the Park Avenue search warrant, but that he did not sign the credit card slips. He also testified that the evidence very strongly supported the proposition that Jaqueline signed the 13 checks processed after December 17, 2009, and also wrote the numeral and narrative dollar amounts, but that she did not write the payee and date entries. Eggleston testified that the evidence moderately supported the proposition that one person wrote the payee and date entries on all 13 checks.

### (d) Motion to Dismiss

Prior to trial, Oliveira-Coutinho filed a motion to dismiss, alleging that witnesses who would have provided exculpatory evidence were deported, thus violating his due process and compulsory process rights under the Fifth and Sixth Amendments to the U.S. Constitution and article I of the Nebraska Constitution. On appeal, Oliveira-Coutinho is primarily concerned with the testimony of Ricardo Gonzalez-Mendez and of Lourenco-Batista, though at trial, he also sought testimony from Diaz.

At a hearing on the motion, evidence was produced to suggest that Oliveira-Coutinho was involved in a romantic relationship with Gonzalez-Mendez at the time of the murders. Oliveira-Coutinho claimed that Gonzalez-Mendez could provide him with an alibi.

The district court noted first that two others were allegedly with Oliveira-Coutinho and Gonzalez-Mendez on the night

---

[4] See *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001).

of the murders and that one of those individuals had been located but had not confirmed Oliveira-Coutinho's alibi.

The district court also noted that the time line of events did not support Oliveira-Coutinho's claim that his due process and compulsory process rights were violated. Rather, the time line shows that Oliveira-Coutinho was first questioned on February 1, 2010, and was placed on a U.S. Immigration and Customs Enforcement (ICE) hold within 24 hours after the interview. He had been in custody since that time and had been given his *Miranda* rights[5] and interviewed multiple times. Within a few hours of asking for an attorney on March 11, Oliveira-Coutinho had one.

Meanwhile, Gonzalez-Mendez was ordered removed on April 15, 2010, and following a felony conviction for criminal impersonation, was deported on October 20. Lourenco-Batista was ordered removed from the United States on April 22, 2010; he was later deported. Despite an international warrant for his arrest, Lourenco-Batista remains at large. Meanwhile, Oliveira-Coutinho was not charged with the murders until September 1, 2011, and did not reveal his alibi defense to investigators until later in the fall of 2011.

In sum, the district court denied the motion to dismiss, reasoning that there was a

> total absence of evidence in the record that the federal government departed from normal deportation procedures in the removal of Gonzalez-Mendez or any of the other individuals mentioned . . . nor was any evidence offered in support of this Motion that these individuals were deported by the federal government so that the State of Nebraska could gain an unfair tactical advantage over [Oliveira-Coutinho] at trial. In fact, there was no evidence at the hearing on this Motion to show that either the federal government or the State was aware that these

---

[5] See *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

individuals had the information that [Oliveira-Coutinho] recently disclosed they possessed.

### (e) Motion to Suppress

Oliveira-Coutinho also filed motions to suppress his February 1, 2010, stop, search, and detention, under the Fourth Amendment, and to suppress any statements he made during questioning on March 11, under the Fifth Amendment. The district court held an evidentiary hearing, but ultimately denied both motions. As to the stop, the district court concluded that "[b]ased upon the collective information of the police engaged in their common investigation . . . and given the totality of circumstances, which included this complete language barrier . . . they did satisfy the specific, articulable facts requirement for . . . an investigative stop." Further, the district court found that this encounter used the least intrusive methods reasonably available.

On appeal, Oliveira-Coutinho does not raise any Fifth Amendment claims, but instead argues only that his seizure was illegal under the Fourth Amendment and that, as such, subsequent statements are inadmissible.

### 11. Batson Challenge

During voir dire, the State asked whether any prospective juror had gotten a ticket or had a family member get a ticket; additionally, the State inquired as to whether anyone had spent at least one night in jail or had a family member who had spent one night in jail. A prospective juror, B.H., answered that she had gotten a conviction for driving under the influence in 1997. The juror indicated her ability to be fair and impartial despite the conviction. The State thanked the juror, who then also remembered a 1999 disturbing the peace violation, though the juror could not remember many details. The juror again indicated that she could remain fair and impartial.

The next day, the same juror met privately with the district court and both counsel and indicated that the juror's son had also been convicted of a federal weapons charge and

was currently incarcerated and that the son had previously been convicted of a state weapons charge and sentenced to 3 to 6 years' imprisonment. She indicated that she believed her son had been treated fairly and that she could be fair and impartial.

The State exercised its fourth peremptory strike to remove this juror from the panel. Oliveira-Coutinho made a *Batson* challenge, indicating the State had struck the juror, who was an African-American woman, despite the fact that she stated she could be fair and impartial.[6] The State responded by noting that it was concerned the juror had failed to immediately respond to the question with information about her son's criminal record and also because the juror did not initially remember her disturbing the peace conviction or the background of that conviction; this gave the State pause regarding the juror's memory and her ability to serve as a juror. Finally, the State noted that the juror did have a son who had been convicted of multiple felonies and that in fact, another juror with a similar relationship had been struck using another of the State's peremptory challenges.

The court found that the State had articulated a race-neutral explanation for the strike and overruled Oliveira-Coutinho's challenge.

## 12. Motion for Mistrial

During the State's opening argument, it explained that the primary evidence of the events of the murder would be provided by Goncalves-Santos. The State then stated:

> Goncalves-Santos will come and tell you the truth about that night. And it is brutal and it is horrible. It is frank and honest. He will tell you about unsavory, gut-wrenching details, but it's the truth.
>
> The information that he provides is direct. It's certainly unpleasant, horribly so, but it is corroborated by other

---

[6] See *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

testimony and it's corroborated by independent physical evidence. And you'll hear about the truth from that night from [Goncalves-Santos]. And what you'll also hear about is — it's the truth. He didn't have to tell you. See, you'll hear about [Goncalves-Santos'] being in this room about 13 months ago, this courtroom. You'll hear about his being on trial for homicide, for murder.

[Goncalves-Santos] is not sophisticated. He's illiterate. He's uneducated, and he'd only been — before he was arrested, in the United States about six months. So in the — the course of just having his trial and the case was still being presented against him, the State's case was still ongoing. . . . Goncalves-Santos had those events, the true events weighing on his conscience. He couldn't hold it anymore, and during the course of his trial he broke down.

He, through his attorney, asked Judge Otepka for — for a delay because he wanted to tell the truth. He stopped the trial in the middle of the State's case because he wanted to tell the truth, and he delayed the trial, mind you, at that point in August of 2011, with no physical evidence. It was testimonial at that point, primarily testimonial, but he stopped the trial with no physical evidence because he wanted to tell the truth. He delayed a trial with no physical evidence at that time. When he potentially could be days away from getting acquitted, going back to Brazil even, but he stopped it.

Now, certainly he stopped it, and he was — met with law enforcement, who told him you have to tell the complete truth with all the details. He did that and law enforcement verified it. And the county attorney, our office, allowed him to plead guilty to second-degree murder for the killing of Vanderlei Szczepanik, for what he did, but also so that he could tell the truth. The proviso through all of this was that he must tell the complete and utter truth at all times.

Judge Otepka is the person who — as he described at different times along the process, but you'll hear about this through the evidence of the people involved. Judge Otepka is the one who metes out sentences to any defendant. But as it relates to [Goncalves-Santos, he] believes his life is over no matter what happens to him. But as part of his plea agreement, the county attorney and his attorneys, [Goncalves-Santos'] attorneys, will recommend to the judge a 20-year sentence, as long as he continues and completes [his testimony] telling the truth. Ultimately, Judge Otepka is the one that hands out that sentence.

At the conclusion of the State's opening, a sidebar was held at which Oliveira-Coutinho sought a mistrial or, in the alternative, the district court judge's recusal. Counsel argued that counsel for the State

looked at you [Judge Otepka] and said that Judge Otepka will sentence Goncalves-Santos when he was talking about the deal that the Douglas County Attorney's Office made with Goncalves-Santos. He looked at you and said that Judge Otepka will sentence him.

In that context he was stating that, essentially he was making you a witness, as if you were vouching for the credibility of Goncalves-Santos by giving him the reasonable sentence.

The district court denied both motions.

### 13. ALIBI EVIDENCE

At trial, Oliveira-Coutinho attempted to establish a foundation for an alibi. He sought to introduce evidence, through cross-examination of Goncalves-Santos, that Oliveira-Coutinho and Gonzalez-Mendez were involved in a sexual relationship and that he spent many nights with Gonzalez-Mendez at Gonzalez-Mendez' home. In addition, Oliveira-Coutinho sought to introduce evidence that he had looked for Gonzalez-Mendez following the latter's deportation, but that the search was unsuccessful.

The judge sustained the State's relevancy objections on each. As to the relationship with Oliveira-Coutinho, in an offer of proof, Goncalves-Santos testified that he was aware that Oliveira-Coutinho spent many evenings with Gonzalez-Mendez, though there was no specific testimony by Goncalves-Santos (or anyone else) that Oliveira-Coutinho spent the evening of the murders with Gonzalez-Mendez. As for the search for Gonzalez-Mendez, an investigator testified that it was possible to locate individuals who were in other countries; however, no testimony as to the ultimately futile efforts to locate Gonzalez-Mendez was permitted.

## 14. REENACTMENT OF MURDERS

At trial, Oliveira-Coutinho sought to introduce evidence, through the testimony of yet another investigator, that Jaqueline's and Christopher's murders could not have occurred as the State theorized. That investigator testified, in an offer of proof, to a reenactment that he and a colleague tried at the crime scene. The investigator testified that a rope was tied to the colleague's neck and that the colleague then walked down the stairs, but at no point was ever suspended. Oliveira-Coutinho argued that this reenactment showed that Goncalves-Santos was lying about how Jaqueline and Christopher were killed.

Following the offer of proof, the district court formally sustained the State's foundation objection to the investigator's testimony and accompanying photographs. The district court reasoned that any experiments, in order to be admissible, must be done under substantially similar circumstances to the original event, but that there was no evidence that this was the case here.

## 15. TESTIMONY OF FORENSIC ANTHROPOLOGIST AND DENTIST AND ADMISSION OF PHOTOGRAPHS OF SKELETAL REMAINS

At trial, the State offered the testimony of Michael Finnegan, a forensic anthropologist, and of John Filippi, a forensic dentist.

Both examined the skeletal remains found in the Missouri River, primarily for identification purposes. Finnegan testified that his examination indicated that the remains belonged to a person around 8.2 years of age, plus or minus 1 year. He also testified that the victim had suffered a perimortem nasal fracture, though he could not tell for certain whether the fracture was suffered just prior to or just after death. Filippi testified that based on his examination, he placed the age of the remains at 7 years, plus or minus 2 years.

In addition to their examinations, according to Filippi, Finnegan used a drill belonging to Filippi to remove DNA from the humerus bone of the skeletal remains. That DNA sample later came back as a match to Christopher.

Oliveira-Coutinho filed a motion to strike the testimony of each expert or, in the alternative, a motion for mistrial, and also objected to the admission of exhibits Nos. 553, 558, 566, 569, and 571. Those exhibits were photographs of the skeletal remains found in this case, including several close-ups of the skull taken from different angles. Counsel argued that the photographs were cumulative and unduly prejudicial. That objection was overruled based on the State's contention that the photographs were necessary for the testimony of Finnegan and Filippi. The objection to the photographs was renewed during Finnegan's testimony and was overruled. The district court denied the motions to strike and the motions for mistrial.

### 16. MOTION FOR NEW TRIAL

Following the guilty verdicts, Oliveira-Coutinho filed a motion for new trial on the basis of newly discovered evidence. That evidence consisted of the affidavit of Kak Thoan. Thoan was placed in a holding cell at the Douglas County Courthouse with Goncalves-Santos. During their time together, which was confirmed by court records, Goncalves-Santos allegedly told Thoan that Oliveira-Coutinho was "not a good person," but that Oliveira-Coutinho did not kill the Szczepanik family and was not there when Goncalves-Santos killed the family.

Thoan also noted in his affidavit that "it was clear to me [that Goncalves-Santos] was crazy. He had mental problems. He would laugh after every statement he made."

The district court denied the motion for new trial, reasoning that Thoan's testimony only went to Goncalves-Santos' credibility and was insufficient to support a new trial. In addition, the court noted that Thoan's statements were not wholly inconsistent with Goncalves-Santos' testimony: Goncalves-Santos testified that he and Lourenco-Batista, but not Oliveira-Coutinho, actually killed the Szczepanik family and that Oliveira-Coutinho was not in the room at the time of the murders. The district court also noted that Thoan and Goncalves-Santos were speaking English, which was neither's primary language.

## III. ASSIGNMENTS OF ERROR

On appeal, Oliveira-Coutinho assigns that the district court erred in (1) not granting his *Batson* challenge, (2) denying his request to sequester the jury during the trial, (3) denying his motion to suppress, (4) denying his motion to dismiss due to the deportation of several witnesses, (5) denying his motion for advanced ruling on certain evidentiary issues, (6) denying his motion in limine regarding the testimony of the State's handwriting expert, (7) not admitting alibi evidence, (8) not admitting evidence of the reenactment of the murders by his investigators, (9) admitting a photograph of the Szczepanik family, (10) denying his motion for new trial based on newly discovered evidence, (11) denying his motion for mistrial based on the State's opening statements, and (12) not granting a mistrial or striking the testimony of the State's forensic anthropologist and dentist and in admitting photographs of Christopher's skeletal remains for the purposes of that testimony.

## IV. ANALYSIS

### 1. *BATSON* CHALLENGE

In his first assignment of error, Oliveira-Coutinho assigns that the district court erred in not granting his *Batson* challenge

to the State's exercise of its peremptory challenge against juror B.H.

(a) Standard of Review

[1,2] An appellate court reviews de novo the facial validity of an attorney's race-neutral explanation for using a peremptory challenge as a question of law.[7] An appellate court reviews for clear error a trial court's factual determination regarding whether a prosecutor's race-neutral explanation is persuasive and whether the prosecutor's use of a peremptory challenge was purposefully discriminatory.[8]

(b) Analysis

[3-5] In *Batson v. Kentucky*,[9] the U.S. Supreme Court held that a prosecutor's privilege to strike individual jurors through peremptory challenges was subject to the commands of the Equal Protection Clause. A prosecutor is ordinarily entitled to exercise permitted peremptory challenges for any reason at all, if that reason is related to his view concerning the outcome of the case.[10] But the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely because of their race.[11]

[6] Determining whether a prosecutor impermissibly struck a prospective juror based on race is a three-step process.[12] First, a defendant must make a prima facie showing that the prosecutor exercised a peremptory challenge because of race. Second, assuming the defendant made such a showing, the prosecutor must offer a race-neutral basis for striking the juror. And third, the trial court must then determine whether the defendant has carried his or her burden of proving purposeful

---

[7] *State v. Nave*, 284 Neb. 477, 821 N.W.2d 723 (2012).

[8] *Id.*

[9] *Batson v. Kentucky, supra* note 6.

[10] See *id.*

[11] See *id.*

[12] See *State v. Nave, supra* note 7.

discrimination.[13] The third step requires the trial court to evaluate the persuasiveness of the justification proffered by the prosecutor.[14] But the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.[15]

Here, the trial court determined that Oliveira-Coutinho had presented a prima facie case that the prosecutor had exercised the State's peremptory challenge because of the juror's race. The State then offered its reasons for the strike, which the trial court determined were race neutral and persuasive. On this basis, the trial court overruled Oliveira-Coutinho's *Batson* challenge.

[7] Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has decided the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing is moot.[16] Thus, we must determine only whether the prosecutor's reasons were race neutral and whether the trial court's final determination regarding purposeful discrimination was clearly erroneous.[17]

[8] The initial question whether a prosecutor's reasons for a peremptory challenge were race neutral is a question of law that we review de novo.[18] The question is whether the stated reasons, on their face, were inherently discriminatory.[19] In making that determination, we do not consider whether the prosecutor's reasons are persuasive.[20] Indeed,

---

[13] *Id.*

[14] *Id.*

[15] See *id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

while the prosecutor's reasons must be comprehensible, they need not be persuasive or even plausible, if they are not inherently discriminatory.[21]

In support of the exercise of the challenge, the State noted it was concerned because juror B.H. had failed to immediately respond to the question with information about her son's criminal record and because juror B.H. did not initially remember her disturbing the peace conviction or the background of that charge, which gave the State pause regarding juror B.H.'s memory and her ability to serve as a juror. Finally, the State noted that juror B.H. had a son who had been convicted of multiple felonies and that, in fact, another juror with a similar relationship had been struck using another of the State's peremptory challenges.

We conclude that these reasons, on their face, are racially neutral. We therefore move on to the third and final step of our analysis: whether Oliveira-Coutinho proved that the district court clearly erred in finding no purposeful discrimination by the prosecutor. In support of his position, Oliveira-Coutinho argues that the State's reasons were perhaps race neutral, but were unpersuasive, because the explanation ignored juror B.H.'s assertion that she felt her son was treated fairly and had received a fair sentence and that what had happened to him would not affect her ability to be a fair and impartial juror.

[9] The U.S. Supreme Court has explained that the third step of a *Batson* inquiry involves evaluating the prosecutor's credibility and that the best evidence of discriminatory intent "'often will be the demeanor of the attorney who exercise[d] the challenge.'"[22] Such credibility determinations lie within the peculiar province of the trial judge and "'in the absence

---

[21] *Id.*

[22] *Snyder v. Louisiana*, 552 U.S. 472, 477, 128 S. Ct. 1203, 170 L. Ed. 2d 175 (2008).

of exceptional circumstances,'" require deference to the trial court.[23] As we noted in *State v. Nave*,[24] this deference is reflected in our standard of review.

We cannot conclude that this case is the "exceptional" case where the trial court's determination should be reversed. As the State noted, another juror was challenged due to a family member with a criminal record. Though juror B.H. did indicate she could remain fair and impartial, it was permissible for the State to remain skeptical, not only because of the parent-child relationship, but because juror B.H. did not initially disclose the conviction. In addition, the State's reason for its concern about juror B.H.'s memory was appropriate, as the trial was anticipated to last 2 weeks and contain hundreds of exhibits and many witnesses.

We conclude that the district court did not clearly err in overruling Oliveira-Coutinho's *Batson* challenge. Oliveira-Coutinho's first assignment of error is without merit.

## 2. Jury Sequestration

In his second assignment of error, Oliveira-Coutinho assigns that the district court erred in denying his motion to sequester the jury during the trial. His motion to sequester the jury during deliberations was granted, and the jury was so sequestered at that time.

### (a) Standard of Review

[10] Whether a jury is to be kept together before submission of the cause in a criminal trial is left to the discretion of the trial court.[25]

### (b) Analysis

[11] To warrant reversal, denial of a motion to sequester the jury before submission of the cause must be shown to have

---

[23] *Id.*

[24] *State v. Nave, supra* note 7.

[25] *State v. Gales*, 269 Neb. 443, 694 N.W.2d 124 (2005).

prejudiced the defendant.[26] No such prejudice was shown in this case.

[12] Immediately after they were sworn, the jurors here were admonished not to discuss the case among themselves or anyone else when court was not in session, and not to read, view, or listen to any news reports regarding the case. Jurors are presumed to follow their instructions unless evidence to the contrary is shown.[27]

The fact that two prospective jurors admitted during voir dire that they ignored the admonishment is not relevant to our determination of prejudice for the simple matter that these jurors were not chosen for the jury. Moreover, though alleged, Oliveira-Coutinho has not shown the nature of the apparent pervasive media attention or that the jurors were actually exposed to that publicity.[28]

The district court did not abuse its discretion in denying Oliveira-Coutinho's motion to sequester the jury during trial. Oliveira-Coutinho's second assignment of error is without merit.

### 3. Motion to Suppress

In his third assignment of error, Oliveira-Coutinho assigns that the district court erred in denying his motion to suppress. Oliveira-Coutinho argues that he was unlawfully seized for purposes of the Fourth Amendment on February 1, 2010, as officers prepared to execute search warrants on the South 16th Street and Park Avenue addresses. Oliveira-Coutinho therefore contends that "any and all observations, evidence and statements derived from [Oliveira-Coutinho's] stop, warrantless search of his person, and arrest" should be suppressed.[29]

---

[26] *Id.*

[27] See *State v. McPherson*, 266 Neb. 715, 668 N.W.2d 488 (2003).

[28] See *State v. Boppre*, 234 Neb. 922, 453 N.W.2d 406 (1990).

[29] Brief for appellant at 22.

### (a) Standard of Review

[13] In reviewing a trial court's ruling on a motion to suppress evidence based on a claimed violation of the Fourth Amendment, we apply a two-part standard of review.[30] Regarding historical facts, we review the trial court's findings for clear error. But whether those facts trigger or violate Fourth Amendment protections is a question of law that we review independently of the trial court's determination.[31]

### (b) Analysis

[14,15] Evidence obtained as the direct or indirect "fruit" of an illegal search or seizure, "the poisonous tree," is inadmissible in a state prosecution and must be excluded.[32] To determine whether the evidence is a "fruit" of the illegal search or seizure, a court asks whether the evidence has been come at by exploitation of the primary illegality or whether it has instead been come at by means sufficiently distinguishable to be purged of the primary taint.[33] There are three general exceptions to the exclusionary rule to aid in this analysis.

[16-18] Under the "independent source doctrine," the challenged evidence is admissible if it came from a lawful source independent of the illegal conduct.[34] Under the "attenuated connection doctrine," the challenged evidence is admissible if the causal connection between the constitutional violation and the discovery of the evidence is so attenuated as to rid the taint.[35] And under the "inevitable discovery doctrine," the challenged evidence is admissible if it inevitably would have

---

[30] *State v. Knutson*, 288 Neb. 823, 852 N.W.2d 307 (2014).

[31] *Id.*

[32] *In re Interest of Ashley W.*, 284 Neb. 424, 821 N.W.2d 706 (2012).

[33] See *id.* (citing *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963).

[34] *U.S. v. Reinholz*, 245 F.3d 765 (8th Cir. 2001).

[35] *Id.*

been discovered by lawful means without reference to the police misconduct.[36]

In Oliveira-Coutinho's brief, other than a general assertion that "observations, evidence and statements" should be suppressed, he does not explain what items require suppression.[37] It is therefore difficult to analyze this assignment of error. Before the district court, Oliveira-Coutinho argued as follows: He was initially stopped and seized on February 1, 2010, in violation of the Fourth Amendment; he was questioned on that day and then placed on an ICE hold; and he eventually reestablished contact with law enforcement and implicated Goncalves-Santos in an interview on March 11.

The State eventually charged Goncalves-Santos with murder, and he was put on trial. During his trial, Goncalves-Santos decided to cooperate with the State and testify against Oliveira-Coutinho. Oliveira-Coutinho was charged with first degree murder, and Goncalves-Santos testified against him. Oliveira-Coutinho apparently argues, in essence, that all of Goncalves-Santos' testimony should be suppressed because he, Oliveira-Coutinho, was unlawfully seized over 2 years before.

Assuming without deciding that there was an unlawful seizure under the Fourth Amendment, all three exceptions to the exclusionary rule have applicability here. To begin, the inevitable discovery doctrine is applicable. Law enforcement questioned Goncalves-Santos at the Park Avenue address on February 1, 2010, when executing the search warrant. In interviewing Goncalves-Santos and searching his property, they discovered clothing matching that worn by the persons in the Wal-Mart surveillance video. Oliveira-Coutinho was also connected to this surveillance video. Thus, law enforcement would have inevitably discovered Goncalves-Santos' involvement in this matter to the extent that his involvement was not already apparent to law enforcement prior to Oliveira-Coutinho's statements to that effect on March 11.

---

[36] *Id.*

[37] See brief for appellant at 22.

In addition to the inevitable discovery doctrine, law enforcement had an independent source regarding Goncalves-Santos' involvement—his wife, who ultimately testified at Goncalves-Santos' trial that Goncalves-Santos admitted his participation in the murders.

Finally, the evidence was also sufficiently attenuated as to rid itself of any taint from any alleged Fourth Amendment violation. Though Oliveira-Coutinho contends he was seized on February 1, 2010, he was not initially held by the State on any charges related to the Szczepanik family's disappearance, but instead was placed on an ICE hold by the federal government. Between March 6 and 11, Oliveira-Coutinho contacted an investigator in this case and spoke to him, against his attorney's advice, regarding Goncalves-Santos' involvement on March 11. Thirty-eight days elapsed between Oliveira-Coutinho's February 1 encounter with law enforcement and the March 11 interview regarding Goncalves-Santos. This length of time, the fact that Oliveira-Coutinho's voluntary statement led law enforcement to Goncalves-Santos, and the fact that law enforcement had other reasons to suspect Goncalves-Santos, lead to the conclusion that the causal connection was so attenuated as to remove any taint.

The district court did not err in denying Oliveira-Coutinho's motion to suppress. Oliveira-Coutinho's third assignment of error is without merit.

### 4. Deportation of Witnesses

In his fourth assignment of error, Oliveira-Coutinho assigns that the district court erred in denying his motion to dismiss. The basis of his motion was the federal government's deportation of several individuals who Oliveira-Coutinho contends could have provided material evidence to his defense. Oliveira-Coutinho asserts that his Fifth Amendment due process rights and Sixth Amendment compulsory process rights under the U.S. Constitution, and the equivalent protections under the Nebraska Constitution, were violated as a result of these deportations.

(a) Standard of Review

[19,20] The determination of whether the procedures afforded an individual comport with the constitutional requirements for procedural due process presents a question of law.[38] Likewise, claimed violations of the compulsory process right are reviewed de novo.[39]

(b) Analysis

The Fifth Amendment to the U.S. Constitution provides: "No person shall . . . be deprived of life, liberty, or property, without due process of law . . . ." Article I, § 3, of the Nebraska Constitution provides the same protection. And the Sixth Amendment to the U.S. Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor . . . ." Similarly, Neb. Const. art. I, § 11, provides that "the accused shall have the right . . . to have process to compel the attendance of witnesses in his behalf."

This right is not absolute, however. In *U.S. v. Valenzuela-Bernal*,[40] the U.S. Supreme Court addressed the extent of the compulsory process right when the government deports an individual that a defendant wishes to call as a witness. The Court held that the "mere fact that the Government deports [illegal-alien] witnesses is not sufficient to establish a violation of the Compulsory Process Clause of the Sixth Amendment or the Due Process Clause of the Fifth Amendment."[41] The Court further noted that "[s]anctions may be imposed on the Government for deporting witnesses only if the criminal defendant makes a plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative

---

[38] *State v. Boppre*, 280 Neb. 774, 790 N.W.2d 417 (2010).

[39] *U.S. v. Damra*, 621 F.3d 474 (6th Cir. 2010).

[40] *U.S. v. Valenzuela-Bernal*, 458 U.S. 858, 102 S. Ct. 3440, 73 L. Ed. 2d 1193 (1982).

[41] *Id.*, 458 U.S. at 872-73.

to the testimony of available witnesses,"[42] such that there is "a reasonable likelihood that the testimony could have affected the judgment of the trier of fact."[43]

The U.S. Supreme Court later relied upon *Valenzuela-Bernal* in its decision in *Youngblood v. Arizona*.[44] In *Youngblood*, the government intentionally destroyed evidence. Citing to *Valenzuela-Bernal* and other cases, the Court held that the failure of law enforcement to preserve potentially useful evidence was not a denial of due process, absent a showing of bad faith on the part of the government.

Since the U.S. Supreme Court's decision in *Youngblood*, several circuit courts of appeal have addressed whether the compulsory and due process rights of a defendant were violated where a potential witness was deported. All, save the Fifth Circuit, have read *Valenzuela-Bernal* and *Youngblood* together to hold that in order to show a violation of due process or compulsory process rights, a defendant must "first make an initial showing that the government has acted in bad faith, and, having made that showing, must then make some plausible showing that the testimony of the deported witness would have been both material and favorable to his defense."[45] The Fifth Circuit has discussed the issue, but has not yet determined whether it would require a showing of bad faith.[46]

---

[42] *Id.*, 458 U.S. at 873.

[43] *Id.*, 458 at 874.

[44] *Youngblood v. Arizona*, 488 U.S. 51, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988).

[45] *U.S. v. Damra, supra* note 39, 621 F.3d at 489-90. See, also, *U.S. v. De La Cruz Suarez*, 601 F.3d 1202 (11th Cir. 2010); *U.S. v. Chaparro-Alcantara*, 226 F.3d 616 (7th Cir. 2000); *U.S. v. Iribe-Perez*, 129 F.3d 1167 (10th Cir. 1997); *U.S. v. Dring*, 930 F.2d 687 (9th Cir. 1991). See, also, *State v. Estrella*, 277 Conn. 458, 893 A.2d 348 (2006).

[46] *U.S. v. Gonzales*, 436 F.3d 560 (5th Cir. 2006). See, also, *People v. Valencia*, 218 Cal. App. 3d 808, 267 Cal. Rptr. 257 (1990) (court did not address whether showing of bad faith is required); *People v. Holmes*, 135 Ill. 2d 198, 552 N.E.2d 763, 142 Ill. Dec. 172 (1990) (court rejected bad faith requirement in case involving unavailable, but not deported, witness).

How a defendant shows bad faith differs slightly between circuits. In the Ninth Circuit, a defendant must show either (1) that the government departed from normal deportation procedures or (2) that it deported the witnesses to gain an unfair tactical advantage.[47] In the Seventh Circuit, a defendant must show "'"official animus"'" or a "'"conscious effort to suppress exculpatory evidence."'"[48] Here, the focus is on the "Government's knowledge when . . . it arranged for the departure of the witnesses, not on any of its subsequent conduct."[49] Also relevant, if the government interviews the witness or has other information suggesting that he or she could offer exculpatory evidence, the government may not deport him or her without first giving defense counsel a chance to interview him or her.[50]

[21] We agree with the circuit courts that have adopted the above two-pronged test and conclude that a defendant must (1) make an initial showing that the government has acted in bad faith and (2) make a plausible showing that the testimony of the deported witness would have been both material and favorable to his or her defense.

Oliveira-Coutinho cannot meet either prong. He complains about the deportation of Gonzalez-Mendez and Lourenco-Batista. Gonzalez-Mendez, who Oliveira-Coutinho now claims could be an alibi witness, was deported in October 2010. And Lourenco-Batista who, according to Goncalves-Santos, participated in the murders, was deported in early 2011. But Lourenco-Batista and Oliveira-Coutinho were not charged with the murders until September 1, 2011, after Goncalves-Santos began cooperating with the State. Oliveira-Coutinho did not inform the State of his alibi defense until the fall of 2011. Regardless of which test of bad faith might be

---

[47] *U.S. v. Pena-Gutierrez*, 222 F.3d 1080 (9th Cir. 2000).

[48] *U.S. v. Chaparro-Alcantara, supra* note 45, 226 F.3d at 624.

[49] See *id.*

[50] *U.S. v. Leal-Del Carmen*, 697 F.3d 964 (9th Cir. 2012).

applicable, we cannot conclude, based on this time line, that these potential witnesses were deported in bad faith.

Oliveira-Coutinho also cannot meet his burden to show that the witnesses would have provided material and exculpatory evidence. As to his alibi, Oliveira-Coutinho apparently contends that he was with Gonzalez-Mendez and others on the evening of the murder. One of those individuals was interviewed by Oliveira-Coutinho's investigators, but did not confirm the alibi. In addition, though Gonzalez-Mendez was interviewed early in this investigation, he did not provide any exculpatory information about Oliveira-Coutinho. As for Lourenco-Batista, he was a codefendant and, had he been otherwise available to testify, likely would have invoked his Fifth Amendment right to remain silent[51] or would have testified against Oliveira-Coutinho.

The district court did not err in denying Oliveira-Coutinho's motion to dismiss. Oliveira-Coutinho's fourth assignment of error is without merit.

### 5. MOTION FOR ADVANCE RULING ON EVIDENTIARY ISSUES

In his fifth assignment of error, Oliveira-Coutinho assigns that the district court erred in not allowing him to cross-examine Goncalves-Santos regarding his competency and credibility as a witness, including admissions he made, certain behaviors subsequent to the murders, threats against his wife, threats against a cellmate, and other violent behaviors such as mistreating or killing animals. In addition to cross-examination, Oliveira-Coutinho sought to call the cellmate, Diaz, as a rebuttal witness, should Goncalves-Santos deny the accusations on cross-examination.

---

[51] See *U.S. v. Iribe-Perez, supra* note 45. See, also, *U.S. v. Stassi*, 544 F.2d 579 (2d Cir. 1976).

#### (a) Standard of Review

[22] A trial court's determination of the relevancy and admissibility of evidence must be upheld in the absence of abuse of discretion.[52]

#### (b) Analysis

Oliveira-Coutinho argues that his proposed cross-examination was relevant to Goncalves-Santos' competency under rule 601 and to his credibility under rule 607.[53] He further argues that such cross-examination was not prohibited by limits on extrinsic evidence set forth in rule 608(2) and was admissible as "'reverse 404(b)'" evidence.

#### *(i) Competency*

[23] We turn first to Oliveira-Coutinho's contention that the matters upon which he sought to cross-examine Goncalves-Santos were relevant to Goncalves-Santos' competency. We disagree. Rule 601 provides that "[e]very person is competent to be a witness except as otherwise provided in these rules." Competency of a witness is an issue to be determined by the trial court and not by the jury.[54] Yet, Oliveira-Coutinho wished to cross-examine Goncalves-Santos in an attempt to show that Goncalves-Santos was incompetent to testify. But, in fact, the jury could not make such a determination. In addition, Oliveira-Coutinho did not assign that the district court erred in finding that Goncalves-Santos was competent to testify. There is no merit to this argument.

#### *(ii) Credibility*

Oliveira-Coutinho contends that the evidence for which he sought to cross-examine Goncalves-Santos would be admissible to impeach Goncalves-Santos' credibility.

[24] Rule 607 states, "The credibility of a witness may be attacked by any party, including the party calling him." Unlike

---

[52] *State v. Sellers*, 279 Neb. 220, 777 N.W.2d 779 (2010).

[53] Neb. Evid. R. 607, Neb. Rev. Stat. § 27-607 (Reissue 2008)

[54] See *State v. Earl*, 252 Neb. 127, 560 N.W.2d 491 (1997).

competency, the credibility and weight of a witness' testimony are for the jury to determine.[55] Finally, as relevant, rule 608(2) explains:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in section 27-609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness be inquired into on cross-examination of the witness (a) concerning his character for truthfulness or untruthfulness, or (b) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

Though under rule 608(2), specific instances of conduct by a witness to attack his or her credibility are not provable by extrinsic evidence, Oliveira-Coutinho nevertheless argues that this evidence was admissible, because it was directly relevant to both "material issues of the case" and Goncalves-Santos' bias "in favor of himself and against [Oliveira-Coutinho]," as well as "Goncalves[-Santos'] attempts to threaten, intimidate and tamper with witnesses," which Oliveira-Coutinho refers to as "conscious guilt."[56] Oliveira-Coutinho is correct in that he argues that specific conduct evidence can be admissible insofar as it is directly relevant to bias[57] or to the material issues of the case.[58] But as demonstrated below, the specific conduct he seeks to admit was nevertheless irrelevant and inadmissible.

We begin with the alleged admissions made by Goncalves-Santos to Diaz. At trial, Goncalves-Santos testified that he had not told anyone except his wife about the murders, denied

---

[55] *Id.*

[56] Brief for appellant at 27-28, 32.

[57] See *United States v. Abel*, 469 U.S. 45, 105 S. Ct. 465, 83 L. Ed. 2d 450 (1984).

[58] See *U.S. v. Calle*, 822 F.2d 1016 (11th Cir. 1987).

that he was unhappy with Vanderlei, and stated that Oliveira-Coutinho told him, Goncalves-Santos, to kill the Szczepanik family. Because Diaz had been deported and was unavailable to testify, Oliveira-Coutinho was permitted to introduce portions of Diaz' trial testimony from Goncalves-Santos' trial in an effort to impeach Goncalves-Santos' later testimony at Oliveira-Coutinho's trial. The introduced testimony included Diaz' statements that Goncalves-Santos had complained Vanderlei had treated him poorly and had not paid him well, that Goncalves-Santos said "'he [Goncalves-Santos] did it,'" and that Goncalves-Santos did not tell Diaz that others were involved.

Through this testimony, Oliveira-Coutinho was permitted to introduce Goncalves-Santos' admissions to impeach his testimony. For that reason, there is no merit to Oliveira-Coutinho's argument that he be allowed to impeach Goncalves-Santos with his admissions to Diaz.

Oliveira-Coutinho also argues that he should have been allowed to cross-examine Goncalves-Santos regarding Goncalves-Santos' alleged threats to kill Diaz if Diaz repeated Goncalves-Santos' admissions. Oliveira-Coutinho argues these threats are relevant to show Goncalves-Santos felt "conscious guilt" over the Szczepaniks' murders.[59]

But in his testimony at Oliveira-Coutinho's trial, Goncalves-Santos admitted his guilt. It was therefore unnecessary to introduce these threats, which are specific acts of misconduct prohibited by rule 608(2), to show any conscious guilt. The district court did not err in not allowing Oliveira-Coutinho to cross-examine Goncalves-Santos on this point.

The district court also did not err in not allowing cross-examination regarding threats made by Goncalves-Santos against his wife. These threats are not relevant to Goncalves-Santos' alleged bias against Oliveira-Coutinho, or to any material issues of the case as identified by Oliveira-Coutinho or otherwise. Nor are they relevant to Goncalves-Santos'

---

[59] Brief for appellant at 32.

conscious guilt because, of course, any conscious guilt is irrelevant where Goncalves-Santos has admitted his actual guilt.

In addition, Oliveira-Coutinho sought to introduce evidence of Goncalves-Santos' certain "concerning behaviors" while incarcerated after being arrested for the Szczepaniks' murders.[60] This evidence has no relevance to any bias on the part of Goncalves-Santos, and its introduction would not contradict Goncalves-Santos' testimony that he killed the family at Oliveira-Coutinho's direction.

Oliveira-Coutinho also sought to introduce evidence showing Goncalves-Santos' violence toward animals. Oliveira-Coutinho is apparently arguing that this evidence shows Goncalves-Santos was violent, independent of any direction by Oliveira-Coutinho. There is nothing in Goncalves-Santos' testimony suggesting that he had to be persuaded to kill the family or that he was ordinarily not a violent person. In fact, Goncalves-Santos' testimony shows that he was a violent person. This evidence is not relevant to show any alleged bias against Oliveira-Coutinho.

Finally, Oliveira-Coutinho argues that Diaz' testimony, in which he discussed certain "concerning behaviors" of Goncalves-Santos, was admissible under rule 404(2) as so-called reverse 404(b) of the Federal Rules of Evidence, relevant to show Goncalves-Santos' consciousness of guilt. Rule 404(2) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Oliveira-Coutinho argues that "[i]f [Diaz'] testimony was relevant to proving Goncalves[-Santos'] guilt at his trial, it is

---

[60] *Id.* at 27.

inconceivable that the same evidence was not admissible in [Oliveira-Coutinho's] trial to show third-party guilt . . . ."[61]

We disagree. At his own trial, Goncalves-Santos had pled not guilty and the State was tasked with proving his guilt beyond a reasonable doubt. Diaz' testimony regarding actions of Goncalves-Santos that might have shown conscious guilt is arguably relevant. But, as noted above, at Oliveira-Coutinho's trial, Goncalves-Santos admitted his guilt. It was unnecessary to admit the evidence sought by Oliveira-Coutinho to prove conscious guilt of a person who did not deny his guilt.

Finally, to the extent Oliveira-Coutinho argues that Goncalves-Santos had an incentive to testify against him in order to secure the benefit of his plea deal, we note that the jury was informed of the plea deal and the reasons for Goncalves-Santos' cooperation at Oliveira-Coutinho's trial.

In sum, the specific acts upon which Oliveira-Coutinho sought to cross-examine Goncalves-Santos violated the prohibition against such evidence set forth in rule 608(2) and were not relevant to show Goncalves-Santos' bias against Oliveira-Coutinho or to rebut the material issues in the case against Oliveira-Coutinho. The district court did not err in not allowing Oliveira-Coutinho to cross-examine Goncalve-Santos as argued above. There is no merit to Oliveira-Coutinho's fifth assignment of error.

## 6. HANDWRITING EXPERT

In his sixth assignment of error, Oliveira-Coutinho assigns that the district court erred in admitting the testimony of Eggleston, the State's handwriting expert. Oliveira-Coutinho argues that Eggleston's testimony does not reach the standards set forth under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[62] and *Schafersman v. Agland Coop*.[63]

---

[61] *Id.* at 32.

[62] *Daubert v. Merrell Dow Pharmaceuticals, Inc., supra* note 4.

[63] *Schafersman v. Agland Coop, supra* note 4.

(a) Standard of Review

[25] The standard for reviewing the admissibility of expert testimony is abuse of discretion.[64]

(b) Analysis

In support of his contention that Eggleston's testimony was unreliable and thus inadmissible, Oliveira-Coutinho cites to the decision of the U.S. District Court for the District of Nebraska in *U.S. v. Rutherford*.[65] There, the court concluded that the "handwriting analysis testimony on unique identification lacks both the validity and reliability of other forensic evidence, such as fingerprint identification or DNA evidence."[66]

Since that decision, several federal circuit courts of appeal have addressed the same basic issue. Each court presented with the issue has concluded that even subsequent to the U.S. Supreme Court's decision in *Daubert* and *Kuhmo Tire Co. v. Carmichael*,[67] such handwriting identification evidence can be valid and reliable and therefore admissible.[68] As one federal court has noted, there is "broad discretion and flexibility given to trial judges to determine how and to what degree these factors should be used to evaluate the reliability of expert testimony [which] dictate[s] a case-by-case review rather than a general pronouncement that . . . handwriting analysis is reliable."[69]

An examination of the record on Oliveira-Coutinho's motion shows that Eggleston, who was accredited in his field,

---

[64] *State v. McClain*, 285 Neb. 537, 827 N.W.2d 814 (2013).

[65] *U.S. v. Rutherford*, 104 F. Supp. 2d 1190 (D. Neb. 2000).

[66] *Id*. at 1193.

[67] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).

[68] *U.S. v. Prime*, 431 F.3d 1147 (9th Cir. 2005); *U.S. v. Crisp*, 324 F.3d 261 (4th Cir. 2003); *U.S. v. Mooney*, 315 F.3d 54 (1st Cir. 2002); *U.S. v. Jolivet*, 224 F.3d 902 (8th Cir. 2000). See, also, *U.S. v. Paul*, 175 F.3d 906 (11th Cir. 1999).

[69] *U.S. v. Prime, supra* note 68 at 1152.

testified at Oliveira-Coutinho's *Daubert*/*Schafersman* hearing that the theory that no two individuals write identically is generally accepted and has been subjected to tests that have been printed in peer review journals. Eggleston further explained his methodology and acknowledged that the probability statistics in his field were different than that for DNA or chemical analysis.

In denying the motion to exclude Eggleston's testimony, the district court noted the above and also noted the development of the law since *Rutherford* had been decided. Given the comprehensive examination of Eggleston and his field, we cannot conclude that the district court abused its discretion in allowing Eggleston to testify. Oliveira-Coutinho's sixth assignment of error is without merit.

## 7. Alibi Evidence

In his seventh assignment of error, Oliveira-Coutinho assigns that the district court erred in not allowing him to admit evidence of his alibi witness. In particular, Oliveira-Coutinho sought to introduce evidence, through cross-examination of Goncalves-Santos, that he and Gonzalez-Mendez were involved in a relationship and that Oliveira-Coutinho spent many nights with Gonzalez-Mendez at Gonzalez-Mendez' home. In addition, Oliveira-Coutinho sought to introduce evidence that he had looked for Gonzalez-Mendez following the latter's deportation but that the search was unsuccessful.

### (a) Standard of Review

A trial court's determination of the relevancy and admissibility of evidence must be upheld in the absence of abuse of discretion.[70]

### (b) Analysis

[26] Under the Due Process Clause of the 14th Amendment and the Compulsory Process and Confrontation Clauses of the 6th Amendment, a criminal defendant is guaranteed a

---

[70] *State v. Sellers, supra* note 52.

meaningful opportunity to present a complete defense.[71] But "'[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.'"[72] The evidence sought to be introduced here is irrelevant and therefore inadmissible.

Oliveira-Coutinho argues that admitting evidence of his relationship with Gonzalez-Mendez provides foundational support for his alibi. However, Oliveira-Coutinho did not present any alibi evidence at trial. Moreover, any evidence regarding the nature of his relationship with Gonzalez-Mendez has no bearing on Oliveira-Coutinho's whereabouts on December 17, 2009. In other words, the fact that Oliveira-Coutinho had a relationship with Gonzalez-Mendez or spent many nights with him does not show that Oliveira-Coutinho spent the night of the murders with Gonzalez-Mendez. Evidence regarding their relationship is simply irrelevant.

Also irrelevant are Oliveira-Coutinho's ultimately futile efforts to locate Gonzalez-Mendez. The jury was aware that Gonzalez-Mendez had been deported. Oliveira-Coutinho's witness was allowed to testify that it was possible to look for a witness who had been deported to Mexico. But the exact means undertaken by Oliveira-Coutinho to look for Gonzalez-Mendez has no bearing on Oliveira-Coutinho's whereabouts on December 17, 2009, and would accomplish nothing more than inviting the jury to speculate as to Gonzalez-Mendez' testimony had he been called to testify. Such speculation would have been prejudicial and not in any way probative.

The district court did not abuse its discretion in finding this evidence inadmissible. Oliveira-Coutinho's seventh assignment of error is without merit.

---

[71] See *State v. Phillips*, 286 Neb. 974, 840 N.W.2d 500 (2013), *cert. denied* ___ U.S. ___, 134 S. Ct. 1899, 188 L. Ed. 2d 930 (2014).

[72] *Id.* at 996, 840 N.W.2d at 519.

### 8. Reenactment Evidence

In his eighth assignment of error, Oliveira-Coutinho assigns that the district court erred in not admitting evidence of a reenactment of the murders.

#### (a) Standard of Review

The standard for reviewing the admissibility of expert testimony is abuse of discretion.[73]

#### (b) Analysis

[27] This court has held that evidence relating to an illustrative experiment is admissible if a competent person conducted the experiment, an apparatus of suitable kind and condition was utilized, and the experiment was conducted fairly and honestly.[74] It is not essential that conditions existing at the time of the experiment be identical with those existing at the time of the occurrence, but the conditions should be essentially similar, that is, similar in all those factors necessary to make the comparison a fair and accurate one.[75] The lack of similarity regarding the nonessential factors then goes to the weight of the evidence rather than to its admissibility.[76]

Oliveira-Coutinho argues that the experiment was relevant not to recreate the hangings, but to rebut Goncalves-Santos' version of events. Oliveira-Coutinho sought to impeach Goncalves-Santos' testimony about how the hangings occurred, suggesting that his reenactment evidence demonstrated that if the rope had been tied in the manner in which Goncalves-Santos testified, the victims would not have been suspended. He directs us to *U.S. v. Jackson*,[77] which holds that "where the purpose of the experiment is not to recreate

---

[73] *State v. McClain, supra* note 64.

[74] *Perry Lumber Co. v. Durable Servs.*, 266 Neb. 517, 667 N.W.2d 194 (2003).

[75] *Id.*

[76] *Id.*

[77] *U.S. v. Jackson*, 479 F.3d 485, 489 (7th Cir. 2007).

events but simply to rebut or falsify the opposing party's sweeping hypothesis, the substantial similarity requirement is relaxed." In contrast, the State argues that Oliveira-Coutinho's "experimental evidence was a veiled attempt to recreate the events under controlled conditions favorable to him and the substantial similarity requirement is not relaxed."[78] Moreover, the State argues that even if the requirement is relaxed, it is not "eviscerated."[79]

Oliveira-Coutinho argues that we should relax the "substantial similarity" requirement, because the purpose of his reenactment is to rebut Goncalves-Santos' testimony. But even if the requirement is relaxed, we agree that the reenactment is not sufficiently similar to Goncalves-Santos' version of events to offer even appropriate rebuttal to those events.

First, Goncalves-Santos testified that Jaqueline was pushed down the stairs, while the investigator in the reenactment walked down the stairs. And while Goncalves-Santos' testimony could be read to suggest that Christopher was suspended after he was pushed down the stairs, the testimony was clear that Jacqueline landed on the floor. Moreover, Jaqueline's height and weight were unknown, as were the exact kind of rope used and the exact location of where the rope was tied. Finally, the State's pathologist expert witness testified that it was not necessary to be suspended in order to be asphyxiated.

The district court did not err in refusing to admit Oliveira-Coutinho's reenactment evidence. Oliveira-Coutinho's eighth assignment of error is without merit.

## 9. Admission of Family Photograph

In his ninth assignment of error, Oliveira-Coutinho assigns that the district court erred in admitting a photograph of the family. Oliveira-Coutinho contends that its admission was more prejudicial than probative.

---

[78] Brief for appellee at 60.

[79] Id.

### (a) Standard of Review

[28] The admission of photographs into evidence rests largely within the discretion of the trial court, which must determine their relevancy and weigh their probative value against their possible prejudicial effect.[80]

### (b) Analysis

[29] In a homicide prosecution, photographs of a victim may be received into evidence for purposes of identification, to show the condition of the body or the nature and extent of wounds and injuries to it, and to establish malice or intent.[81] We have also noted that a photograph which is admitted at trial depicting a victim while he or she was alive is not offered for a proper purpose.[82]

The district court in this case noted that neither Vanderlei's nor Jaqueline's body was ever found; furthermore, Christopher's remains were not visually identifiable. Under these circumstances, this case is distinguishable from our case law finding the admission of such a photograph to be erroneous. Because the photograph was helpful in identifying the victims, it was not an abuse of discretion to admit it. Oliveira-Coutinho's ninth assignment of error is without merit.

### 10. MOTION FOR NEW TRIAL

In his 10th assignment of error, Oliveira-Coutinho assigns that the district court erred in denying his motion for new trial on the basis of newly discovered evidence in the form of the affidavit from Thoan.

### (a) Standard of Review

[30,31] In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of

---

[80] *State v. Faust*, 265 Neb. 845, 660 N.W.2d 844 (2003), *disapproved on other grounds, State v. McCulloch*, 274 Neb. 636, 742 N.W.2d 727 (2007).

[81] *Id.*

[82] *Id.*

discretion is shown, the trial court's determination will not be disturbed.[83] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[84]

### (b) Analysis

Thoan's statement is discussed in more detail above. Generally, Thoan avers that Goncalves-Santos told him that Oliveira-Coutinho was not involved in the murder of the Szczepanik family.

As an initial matter, Thoan's affidavit is not wholly inconsistent with Goncalves-Santos' testimony. As the district court noted, Goncalves-Santos testified that Oliveira-Coutinho was not in the room when the family was killed. Especially considering that both Thoan and Goncalves-Santos were speaking English when it was the first language of neither, the accuracy of Thoan's recitation of any conversation with Goncalves-Santos is questionable.

[32] In addition, at most, Thoan's affidavit tells a different story from what Goncalves-Santos testified to at trial. We have held that a new trial will not ordinarily be granted for newly discovered evidence which, when produced, will merely impeach or discredit a witness who testified at trial.[85] We have further noted that to justify a new trial, newly discovered evidence must involve something other than the credibility of the witness who testified at trial.[86] In the end, this was all that Thoan's story did.

The district court did not abuse its discretion in denying Oliveira-Coutinho's motion for new trial. There is no merit to Oliveira-Coutinho's 10th assignment of error.

---

[83] *State v. Faust*, 269 Neb. 749, 696 N.W.2d 420 (2005).

[84] *Id.*

[85] *State v. Wycoff*, 180 Neb. 799, 146 N.W.2d 69 (1966).

[86] *State v. Pierce and Wells*, 215 Neb. 512, 340 N.W.2d 122 (1983).

### 11. Opening Statements

In his 11th assignment of error, Oliveira-Coutinho assigned that the district court erred in denying his motion for mistrial on the basis of the State's opening statements. Oliveira-Coutinho contends that the State vouched for the testimony of the State's primary witness and also that the State suggested that the district court was also vouching for Goncalves-Santos when the State noted that the district court would eventually sentence Goncalves-Santos for his role in the murders.

### (a) Standard of Review

Whether to grant a motion for mistrial is within the trial court's discretion, and an appellate court will not disturb its ruling unless the court abused its discretion.[87]

### (b) Analysis

[33-35] When considering a claim of prosecutorial misconduct, we first consider whether the prosecutor's acts constitute misconduct.[88] A prosecutor's conduct that does not mislead and unduly influence the jury is not misconduct.[89] But if we conclude that a prosecutor's acts were misconduct, we next consider whether the misconduct prejudiced the defendant's right to a fair trial.[90]

[36-38] Prosecutorial misconduct prejudices a defendant's right to a fair trial when the misconduct so infected the trial that the resulting conviction violates due process.[91] Whether prosecutorial misconduct is prejudicial depends largely on the context of the trial as a whole.[92] In determining whether the conduct prejudiced the defendant's right to a fair trial,

---

[87] *State v. Dixon*, 286 Neb. 334, 837 N.W.2d 496 (2013).

[88] *State v. Dubray*, 289 Neb. 208, 854 N.W.2d 584 (2014).

[89] *Id.*

[90] *Id.*

[91] *Id.*

[92] *Id.*

we consider the following factors: (1) the degree to which the prosecutor's conduct or remarks tended to mislead or unduly influence the jury, (2) whether the conduct or remarks were extensive or isolated, (3) whether defense counsel invited the remarks, (4) whether the court provided a curative instruction, and (5) the strength of the evidence supporting the conviction.[93]

[39] We note that Oliveira-Coutinho has likely waived any argument that the State erred in directly vouching for Goncalves-Santos when it failed to object to those statements at the time they were made. Failure to make a timely objection waives the right to assert prejudicial error on appeal.[94] However, we conclude that on appeal, Oliveira-Coutinho has preserved his argument that the State suggested the district court was also vouching for Goncalves-Santos.

We need not determine whether the State's action amounted to misconduct, because even if it did, such misconduct was not prejudicial to Oliveira-Coutinho's right to a fair trial. The challenged remarks were made during a portion of the State's opening statements in this case. Such statements were the first remarks in what would be an 11-day trial, complete with nearly 50 witnesses and hundreds of exhibits.

While the jury was not immediately instructed to disregard the prosecutor's statements, it was eventually instructed specifically as follows:

There has been testimony from . . . Goncalves-Santos, a claimed accomplice of [Oliveira-Coutinho]. You should closely examine his testimony for any possible motive he might have to testify falsely. You should hesitate to convict [Oliveira-Coutinho] if you decide that . . . Goncalves-Santos testified falsely about an important matter and that there is no other evidence to support his testimony.

---

[93] *Id.*

[94] *State v. Nadeem*, 284 Neb. 513, 822 N.W.2d 372 (2012).

In any event, you should convict [Oliveira-Coutinho] only if the evidence satisfies you beyond a reasonable doubt of his guilt.

In addition, the jury was instructed by the court that the court was "not permitted to comment on the evidence, and I have not intentionally done so. If it appears to you that I have commented on the evidence, during either the trial or the giving of these instructions, you must disregard such comment entirely." The jury was also instructed that "[s]tatements, arguments, and questions of the lawyers for the State and [Oliveira-Coutinho are not evidence]."

The comments of the prosecutor during his opening statements were isolated in the overall context of the trial, and the jury was instructed specifically on Goncalves-Santos' testimony as well as on issues relating to arguments of counsel versus evidence presented. Finally, the strength of the evidence overall was such that any alleged misconduct in opening statements was not prejudicial to Oliveira-Coutinho's right to a fair trial. There is no merit to Oliveira-Coutinho's 11th assignment of error.

### 12. TESTIMONY OF FORENSIC DENTIST AND PHOTOGRAPHS OF SKELETAL REMAINS

In his 12th and final assignment of error, Oliveira-Coutinho assigns that the district court erred when it did not grant his motions for mistrial or, in the alternative, his motions to strike the testimony of Finnegan, the State's forensic anthropologist, and Filippi, the State's forensic dentist. Oliveira-Coutinho contends that the testimony of each expert was repetitive, cumulative, and prejudicial and, further, that the State misrepresented to the court the actions taken by Filippi during Christopher's autopsy. In addition, Oliveira-Coutinho assigns that the district court erred in admitting exhibits Nos. 553, 558, 566, 569, and 571, which were photographs of Christopher's skeletal remains. Oliveira-Coutinho contends that these photographs were prejudicial.

### (a) Standard of Review

Whether to grant a motion for mistrial is within the trial court's discretion, and an appellate court will not disturb its ruling unless the court abused its discretion.[95]

The admission of photographs into evidence rests largely within the discretion of the trial court, which must determine their relevancy and weigh their probative value against their possible prejudicial effect.[96]

### (b) Analysis

We turn first to Oliveira-Coutinho's assertions regarding the testimony of the anthropologist and the dentist. He contends that these witnesses purportedly testified with respect to identification but, in fact, Christopher's remains were identified through DNA testing and that therefore, the testimony of each expert was unnecessary.

We disagree that the district court abused its discretion in not granting a mistrial or, in the alternative, striking the testimony of these witnesses. Each witness testified as to the identification of the skeletal remains. Finnegan testified as to the age of the person to whom the remains belonged based upon his examination of the bones. Filippi testified as to the age of the person to whom the remains belonged based upon his examination of the teeth.

Moreover, both testified to the procedures followed to extract DNA from the humerus in order to test the DNA for identification purposes. While DNA evidence might be the most common way to identify remains, such does not make any means of additional identification inadmissible. As the State pointed out at trial, even DNA evidence is stated in terms of probability.

Because Filippi, like Finnegan, testified as to the identification of Christopher's remains, we cannot conclude the State mischaracterized Filippi's testimony in order to get the

---

[95] *State v. Dixon, supra* note 87.

[96] *State v. Faust, supra* note 80.

challenged photographs admitted. The district court did not abuse its discretion in denying Oliveira-Coutinho's motions to strike and for mistrial.

We turn next to Oliveira-Coutinho's argument regarding the photographs of Christopher's skeletal remains, exhibits Nos. 553, 558, 566, 569, and 571.

[40,41] As noted earlier, in a homicide prosecution, a court may admit into evidence photographs of a victim for identification, to show the condition of the body or the nature and extent of wounds and injuries to it, and to establish malice or intent.[97] The State is allowed to present a coherent picture of the facts of the crimes charged, and it may generally choose its evidence in so doing.[98] Rule 403[99] does not require a separate purpose for every photograph, and it requires a court to prohibit cumulative evidence only if it substantially outweighs the probative value of the evidence.[100]

First, these photographs were not cumulative. Each was used by the expert witnesses in explaining their examinations and identification processes. In addition, we have examined the photographs and do not find them to be more prejudicial than probative.

The district court did not err in admitting the photographs and in failing to strike the testimony of the experts or in granting a motion for mistrial. Oliveira-Coutinho's final assignment of error is without merit.

## V. CONCLUSION

Oliveira-Coutinho's convictions and sentences are affirmed.

AFFIRMED.

WRIGHT, J., not participating.

---

[97] *State v. Dubray, supra* note 88; *State v. Faust, supra* note 80.

[98] *State v. Dubray, supra* note 88.

[99] Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2008).

[100] *Id.*